**COPY**
Original Filed

**JAN 0 2 2018**

Timothy W. Fitzgerald
SPOKANE COUNTY CLERK

SUPERIOR COURT OF WASHINGTON
FOR SPOKANE COUNTY

GINA L. BRITTON, a single woman, and on
behalf of others similarly situated,

        Plaintiffs,

    vs.

SERVICELINK FIELD SERVICES, LLC,
formerly known as LPS FIELD SERVICES, INC.,

       Defendant.

NO. **1 8 2 0 0 0 0 7 - 1**

COMPLAINT FOR CLASS ACTION
AND DAMAGES

    GINA L. BRITTON, a single woman, and on behalf of others similarly situated, through their attorneys of record, Jeffers, Danielson, Sonn & Aylward, P.S., by Clay M. Gatens and Devon A. Gray, bring this Complaint for Class Action and Damages against ServiceLink Field Services, LLC, formerly known as LPS Field Services, Inc., and allege as follows:

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 1
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

## I.    NATURE OF THE CASE

1.1    ServiceLink Field Services, LLC, formerly known as LPS Field Services, Inc., contracts with mortgage lending and servicing institutions to conduct services on default and pre-foreclosure properties located throughout Washington State that are subject to loans owned, held, or serviced by lending or servicing institutions.  ServiceLink Field Services, LLC, is the successor in interest to LPS Field Services, Inc., which was the entity involved in the events detailed herein, for convenience and clarity this Complaint refers to the Defendant as "LPS Field Services."

1.2    Specifically, LPS Field Services is hired by lending and servicing institutions to (among other things) determine the occupancy status of properties, secure properties deemed vacant or abandoned by LPS Field Services, remove personal property from within the property, and provide miscellaneous other so-called "property preservation services."

1.3    LPS Field Services charges and receives fees for these services from its clients and profits from these fees.

1.4    Such services include but are not limited to:  forcibly entering the property to change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, remove personal property and "debris," install damaging stickers, and turn utilities on and off.

1.5    Lenders and loan servicers' purported right to enter a borrower's property for the purpose of conducting these services is allegedly derived from provisions in the form

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 2
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

contract deed of trust encumbering the borrower's property (the "Entry Provisions").  LPS Field Services purportedly derives its alleged right to trespass upon and enter borrowers' homes from its lender and loan servicer clients. LPS Field Services relies on the Entry Provisions to enter borrowers' properties and conduct services and it is under these form provisions that LPS Field Services commits the above-described "property preservation services."

1.6    On July 7, 2016, in *Jordan v. Nationstar Mortgage, LLC*, No. 92081-8, the Washington State Supreme Court deemed such form deed of trust provisions unenforceable as contrary to Washington State law, thereby eroding any purported legal justification for LPS Field Services to even enter upon borrowers' properties. A true and correct copy of the Supreme Court's order in *Jordan v. Nationstar Mortg., LLC*, 185 Wn.2d 876, 374 P.3d 1195 (2016) is attached hereto as Exhibit A.

1.7    But even setting aside the unenforceability of these form Entry Provisions, the form Entry Provisions as written do not permit LPS Field Services' to damage, destroy, or convert borrowers' property and/or deny the full use and enjoyment of borrowers' real and/or personal property prior to the completion of foreclosure.

1.8    However, LPS Field Services has a common course of conduct whereby it wrongfully and forcibly enters borrowers' properties prior to completion of a foreclosure to perform destructive and disruptive acts, including destroying the existing lock(s) on a borrower's home, removing the borrower's destroyed locks from the home, rummaging

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

through, "trashing out" and damaging property inside the home, and removing the borrower's personal property from the home and property.

1.9     These actions result in damage to the borrower's real and personal property, conversion of the borrower's personal property, and interference with the borrower's full use and enjoyment of their real and personal property.

1.10    LPS Field Services charges and receives fees for these services from its clients and profits from these fees.

1.9     LPS Field Services' common course of conduct and actions are widespread throughout Washington.

1.10    Thus, not only does LPS Field Services have no legal right to be present on borrowers' properties in advance of the completion of any foreclosure proceedings, but LPS Field Services regularly acts beyond the scope of the unenforceable and illegal form deed of trust provisions relied upon by LPS Field Services.

1.11    LPS Field Services' common course of conduct and common practices violate Washington's Consumer Protection Act ("CPA") (RCW 19.86, *et seq.*).

## II.    PARTIES

2.1     Representative Plaintiff Gina L. Britton.  GINA L. BRITTON, formerly known as Gina L. Cargile ("Plaintiff"), is a single woman who owned real property located at 35 East Walton Ave., Spokane, Washington (the "Britton Property").

2.2     Plaintiff has agreed to act as a Class Representative in this matter as "Plaintiff

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 4
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

Britton" or "Representative Plaintiff Britton."

2.3    Defendant.    Defendant SERVICELINK FIELD SERVICES, LLC, formerly known as LPS FIELD SERVICES PROPERTIES, INC. ("LPS Field Services" or "Defendant") is a Delaware limited liability company, with its principal place of business at 10385 Westmoor Drive, Westminster, CO 80021.

2.7    LPS Field Services transacts business throughout the state of Washington, and contracts with and employs agents throughout Washington to provide property inspection and preservation services for homes located in Washington that are in default under the terms of their loan agreement, but which homes have not been foreclosed upon.

2.8    LPS Field Services receives payments and/or profits from the above-described business it transacts throughout the state of Washington.

2.8    LPS Field Services is a citizen of Delaware and Colorado.

2.9    LPS Field Services is one of the nation's largest privately-held mortgage field services providers.

2.10    For purposes of this Complaint, any references to LPS Field Services shall mean such acts and practices that were performed by LPS Field Services, its employees, agents, representatives, vendors, subcontractors and all persons or entities directly or indirectly under LPS Field Services' control.

## III.    JURISDICTION AND VENUE

3.1    This is an action for damages.    Jurisdiction is vested in this Court.

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

3.2    Venue is appropriate in this Court pursuant to RCW 4.12.010 and RCW 4.12.020.

## IV.    BACKGROUND REGARDING LPS FIELD SERVICES' COMMON POLICIES AND PRACTICES

4.1    For purposes of this Complaint, "default properties" shall refer to homes where the borrower is in default on their mortgage, but no foreclosure has been initiated.

4.2    Properties "pre-foreclosure" shall refer to homes where a judicial or non-judicial foreclosure has been initiated, but not completed.

4.3    "Foreclosed properties" shall refer to properties that have had a judicial or non-judicial foreclosure completed and a foreclosure and sale at law has been completed.

### *LPS Field Services' Unfair and Deceptive Business Practices*

4.4    On its website, LPS Field Services advertises its services to potential clients as follows:

> [LPS Field Services] is a national field service company offering a complete range of superior property inspection, preservation and asset registration services.    [LPS Field Services] helps servicers satisfy loan services requirements by addressing the ongoing service challenges they continually face. With additional rules bearing down on the industry, we have the skilled staff and advanced information technology to coordinate and provide field services in every state and locality where our clients service loans.

www.svclnk.com/default/field-services/ (last accessed December 14, 2017)

4.5    LPS Field Services provides to mortgage lenders and servicers property inspection and preservation and maintenance services for default, pre-foreclosure, and

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 6
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

foreclosed properties.

4.6    All borrowers upon whose property LPS Field Services enters are subject to substantively the same form deed of trust Entry Provisions that LPS Field Services relies upon to: (i) enter borrowers' properties in the event of default but prior to completion of foreclosure; and (ii) conduct its illegal services.

4.7    As will be further explained, on July 7, 2016, in *Jordan v. Nationstar Mortgage, LLC*, No. 92081-8, the Washington State Supreme Court held such form deed of trust Entry Provisions unenforceable as contrary to Washington State law, thereby eroding any purported legal justification for LPS Field Services' entry onto borrowers' properties, forcible entry into the borrowers' homes, removal of borrowers' locks, installation of LPS Field Services' lock and lock boxes, damage to borrowers' homes, and conversion of borrowers' personal property prior to the completion of foreclosure.  Exhibit A.

### *LPS Field Services' Retention of Vendors*

4.8    LPS Field Services' involvement with a residential property usually begins once a homeowner becomes delinquent or defaults on his or her mortgage.

4.9    Upon that occurrence, LPS Field Services is retained by a lending or servicing institution to perform inspection and property preservation services on the home.

4.10    LPS Field Services performs such services through a network of vendors trained and supervised by LPS Field Services via a common set of practices.

4.11    LPS Field Services receives fees and/or profits from performing such services

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 7
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

and training and supervising its network of vendors.

4.12    Upon a Washington borrower's delinquency or default, LPS Field Services will instruct a Washington-based field services vendor to inspect the home to determine its occupancy status.

4.13    On information and belief, LPS Field Services does not instruct its vendors on making determinations or distinctions between "vacant" homes versus "abandoned" homes.

4.14    On information and belief, once the home is deemed "vacant" or "abandoned," LPS Field Services instructs its vendors to forcibly enter the home and other buildings and perform services, such as securing buildings by boarding up the doorway or windows, turning off utilities, and placing lockboxes, hasps, or padlocks on the doors to the home and other buildings.

4.15    On information and belief, such common instructions also include that the vendor should forcibly enter the home to perform destructive acts, including destroying and removing existing lock(s) on a home or building, damaging doors or windows to obtain entry, and removing personal property found in and around the home and in and around other buildings.

4.15    These common actions result in damage to the borrower's real and personal property, interference with the borrower's full use and enjoyment of their property, conversion of personal property located within the home, and they exceed the scope of any form deed of trust Entry Provision relied upon by LPS Field Services when instructing its

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O  Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

agents to conduct preservation services upon a borrower's home.

4.16    Vendors perform these services as agents of LPS Field Services and pursuant to specific common orders and directives from LPS Field Services.

4.17    On information and belief, despite extensive use of vendors, LPS Field Services has no common practice of adequately training or supervising its vendors.

4.18    On information and belief, LPS Field Services has no common practice of screening its vendors' employees by way of reviewing qualifications or performing a background check that would uncover any criminal history.

### *LPS Field Services' Process for Determining Occupancy Status and Securing Default and Pre-Foreclosure Homes*

4.19    On information and belief, LPS Field Services' process in inspecting and securing a default or pre-foreclosure home starts when LPS Field Services orders a vendor to determine the occupancy status of the home.

4.20    On information and belief, LPS Field Services does not provide its vendors with clear standards for determining the occupancy status of the home.

4.23    On information and belief, LPS Field Services or its vendors frequently make inaccurate determinations regarding the occupancy status of a home.

4.24    On information and belief, if LPS Field Services or its vendor deems the home vacant or abandoned, LPS Field Services orders its vendor to gain access to the home by forcibly entering the home through locked doors or windows.

4.27    On information and belief, upon entry, LPS Field Services instructs its vendors

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

to remove all personal property and belongings from the home.  The act of removing personal property and belongings found in the home is commonly known as "trashing out" the home.

4.28    On information and belief, once a borrower's home has been trashed out, LPS Field Services does not require its vendors to store, preserve, or track the items that were trashed out of the borrower's home, and LPS Field Services does not have any practicing policy or procedure for returning "trashed out" belongings and personal property to borrowers.

.    4.29    LPS Field Services instructs its vendors to place their own locks and lock boxes and/or its own locks and lock boxes on the borrower's home and post a notice upon the borrower's home instructing the borrower to contact LPS Field Services for access to the home.

4.30    When LPS Field Services learns that a homeowner wants access to his or her home, LPS Field Services does not immediately provide access to the homeowner.

4.31    When LPS Field Services learns that a homeowner wants access to his or her home, LPS Field Services does not immediately remove the locks that it had placed on the home.

4.32    When LPS Field Services learns that a homeowner wants access to his or her home, LPS Field Services does not restore the homeowner's locks to the home.

4.33    When LPS Field Services learns that a homeowner wants the personal property that was removed from the home returned, LPS Field Services does not return the personal

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O  Box 1688
Wenatchee, WA  98807-1688
(509) 662-3685 / (509) 662-2452 FAX

property.

4.34    When LPS Field Services learns that a homeowner wants the damage to the home repaired, LPS Field Services does not repair the damage.

4.35    On information and belief, even after learning of the *Jordan v. Nationstar Mortg., LLC* decision, LPS Filed Services has not removed its locks, lockboxes, and hasps from borrowers' home prior to the conclusion of any foreclosure, and has not affirmatively reached out to any borrowers prior to the conclusion of any foreclosure to offer such removal.

4.36    LPS Field Services' common pattern and practice of using vendors to forcibly enter default and pre-foreclosure homes, cause damage to the borrower's real and personal property, convert the borrower's personal property and belongings located within the home, interfere with the borrower's full use and enjoyment of the home, maintain its locks, lockboxes, and hasps on the borrower's home even after the *Jordan v. Nationstar Mortg., LLC* decision prior to completion of a foreclosure, and obtain profits as a result of these actions is inequitable and unlawful and causes injury to Washington residents.

### *LPS Field Services' Activities are Widespread*

4.37    LPS Field Services has a widespread common practice of forcible entry, resultant damage, removal of personal property from homes, and denial of the owner's full use and enjoyment of their home.

4.38    Various news reports detail specific examples of LPS Field Services' common practices.

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

4.39    In a 2015 article, borrowers reported returning home following LPS Field Services' forcible entry to find the house ransacked, priceless family heirlooms missing and personal possessions destroyed. A true and correct copy of that article is attached hereto as Exhibit B.

4.40    This just a single sample of a long line of similar stories evidencing LPS Field Services' common pattern and practices.

### *The Washington Supreme Court's Decision Invalidated the Deed of Trust Provisions in Jordan v. Nationstar Mortgage, LLC, No. 92081-8*

4.58    In 2012, a lawsuit entitled *Jordan v. Nationstar Mortgage, LLC*, was filed in Washington State Superior Court in Chelan County under Cause No. 12-2-00385-2.  This lawsuit challenged the legality and enforceability of the form deed of trust entry provisions relied upon by mortgage lenders and servicers to enter borrowers' homes and "secure" their properties upon default, abandonment, or vacancy.

4.59    Following the grant of class certification in 2014, counsel for Nationstar removed the Complaint to the United States District Court for the Eastern District of Washington, where it was assigned to the Hon. Thomas O. Rice under Cause No. 2:14-cv-00175-TOR.

4.60    In 2015, the parties filed cross-motions for partial summary judgment, and on August 10, 2015, Judge Rice issued an Order Certifying Questions to Washington Supreme Court on the following bases:

Put succinctly, this Court has been asked to decide whether so-

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

called Entry Provisions within the deeds of trust of Plaintiff and other class members are enforceable under Washington law absent post-default consent of the borrower or permission from a court. Nationstar contends the Provisions—akin to a limited license or similar non-possessory interest in land—merely grant the lender the ability to enter, maintain, and secure the encumbered property and that such conduct does not constitute possession in violation of Washington's lien theory of mortgages. Ms. Jordan, on the other hand, contends the Entry Provisions unlawfully deprive a borrower of her exclusive right to possession prior to foreclosure and that the borrower cannot agree by contract to relinquish such right prior to default. Instead, Ms. Jordan asserts that the lender either must obtain post-default consent of the borrower or a court-appointed receiver pursuant to RCW chapter 7.60.

Because of the complexity of the state law issues presented in the parties' cross-motions for partial summary judgment and their significant policy implications, this Court finds that the Washington Supreme Court, which has not had occasion to settle these issues, "is better qualified to answer the certified questions in the first instance." . . . Further, this Court finds the Washington Supreme Court's answers are "necessary . . . in order to dispose of [this] proceeding."

Exhibit C at pp. 3-4 (internal citations omitted).

4.61    Judge Rice then certified, *inter alia*, the following question of law to the Washington Supreme Court:

Under Washington's lien theory of mortgages and RCW 7.28.230(1), can a borrower and lender enter into a contractual agreement prior to default that allows the lender to enter, maintain, and secure the encumbered property prior to foreclosure?

*Id.* at p. 10.

4.62    On August 18, 2015, the Washington Supreme Court sent a letter accepting

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

Judge Rice's Order Certifying Questions under Supreme Court No. 92081-8, and set a briefing schedule for the parties.

4.63    The parties timely submitted their briefs, and oral argument took placed before the Washington Supreme Court on January 19, 2016.

4.64    On July 7, 2016, the Washington Supreme Court issued its *En Banc* Opinion in *Jordan v. Nationstar Mortgage, LLC*, No. 92081-8, answering "the first certified question in the negative." Exhibit A at p. 6. The Court explained, "Our case law is clear that Washington law prohibits a lender from taking possession of property before foreclosure of the borrower's home." *Id.* at p. 8. The Court concluded that the deed of trust entry provisions allow the lender to take possession of the borrower's home in advance of the conclusion of a foreclosure of the borrower's home:

> From any approach, we find that Nationstar's conduct constituted possession. . . . Nationstar's vendor's actions constituted possession because its actions are representative of control. The vendor drilled out Jordan's existing locks and replaced the lock with its own. . . . [A]lthough [Jordan] was able to obtain a key by calling, the process made Nationstar the "middle man." She could no longer access her home without going through Nationstar. . . . Nationstar effectively ousted Jordan by changing her locks, exercising control over the property. . . . Changing the locks is akin to exercising control, which is the key element of possession. By changing the locks, Nationstar took possession of the property. Since these actions are authorized by the entry provisions, the entry provisions allow the lender to take possession of the property. Because Washington law prohibits lenders from taking possession of the borrower's property before foreclosure, the provisions are in conflict with state law. Therefore, we must answer the first certified question in the negative and find that the entry

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 14
4245190

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

provisions are unenforceable.

*Id.* at pp. 12-14.

4.65    The Court concluded: "[T]he entry provisions are in direct conflict with state law and are unenforceable." *Id.* at p. 20.

4.66    On November 21, 2017, Chief Judge Thomas O. Rice of the United States District Court for the Eastern District of Washington granted in part Plaintiffs' Motion for Partial Summary Judgment in the *Jordan v. Nationstar Mortgage, LLC* case, holding as a matter of law that (1) Nationstar committed intentional trespass, and (2) Nationstar violated Washington's Consumer Protection Act. The Court also held that the class is entitled to damages measured by (1) the cost of restoring each class member's home to its original state prior to rekeying the properties, and (2) the fair market rental value of each class member's home. A true and correct copy of the Court's order is attached hereto as <u>Exhibit D</u>.

4.67    Based on *Jordan*, LPS Field Services has no legal right to engage in its common practice of forcible entry into pre-foreclosure homes, damage to borrowers' real and person property, conversion of borrowers' personal property and belongings located within the home, and interference with borrowers' full use and enjoyment of their properties prior to the completion of a foreclosure.

4.68    Based on *Jordan*, LPS Field Services is liable to Washington borrowers' for the cost of restoring each class member's home to its original state prior to the re-keying of their properties, and (2) the fair market rental value of each class member's home.

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

## V.    REPRESENTATIVE PLAINTIFF

5.1    The Representative Plaintiff is just one example of LPS Field Services' common pattern and practice of unlawfully entering upon borrowers' properties in advance of any foreclosure proceedings, damaging borrowers' real property, converting borrowers' personal property, and denying borrowers' the full use and enjoyment of their property prior to completion of a foreclosure.

### *Representative Plaintiff Gina L. Britton*

5.2    Plaintiff is the former owner of real property located at 35 East Walton Ave., Spokane, Washington (the "Britton Property").

5.4    Plaintiff was the owner of the Britton Property when it was entered upon by LPS Field Services.

5.5    At the time of the entry, the loan securing the Britton Property was in default, but no foreclosure proceedings had been initiated.

5.6    At the time of the entry, the form deed of trust provision purporting to authorize LPS Field Services' presence on the Britton Property in the event of default was unenforceable as contrary to Washington State law, pursuant to *Jordan v. Nationstar Mortgage.*

5.7    At the time of the entry, Plaintiff was in frequent communication with the lender for the Britton Property.

5.8    At the time of the entry, the Britton Property was neither vacant nor

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

abandoned.

5.9    To gain entry to the Britton Property, LPS Field Services damaged the Britton Property, including damaging locks and doors on the Britton Property.

5.10    While on the Britton Property, LPS Field Services changed the locks and placed a lock-box upon the Britton Property.  LPS Field Services also removed and damaged personal property on the Britton Property, including the lock that was originally on the garage door.

5.11    Before leaving, LPS Field Services left stickers and placards inside and outside of the Britton Property directing the owner to call LPS Field Services' phone number for access to the Britton Property and additional information.

5.12    Upon returning to the Britton Property, Plaintiff discovered the Britton Property had been entered upon and the locks had been changed.

5.13    Plaintiff called the numbers for the lender and LPS Field Services written on the sticker.  Plaintiff was told by an LPS customer service representative that she would receive a prompt return phone call but she did not receive a phone call until days later.

5.15    LPS Field Services did not remove its locks or lock box from the Britton Property, despite being contacted by Plaintiff.

5.16    LPS Field Services did not replace the original locks upon the Britton Property despite being contacted by Plaintiff.

5.17    Plaintiff was later provided a key to enter the Britton Property through the

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 17
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

garage door.

5.18    Upon entering the home, Plaintiff discovered the home had been significantly damaged from LPS Field Services' entry, and that a substantial amount of her personal property was missing.

5.19    Plaintiff reported the missing items and the damage to LPS Field Services, and requested return of the missing property and reimbursement and/or repairs to the damaged property.

5.20    Specifically, Plaintiff reported that many fixtures in the home were broken, including her toilet in her newly remodeled bathroom, which left a mess of human waste and debris.

5.21    Additionally, Plaintiff reported that personal property missing from the home included a 1991 Jeep Cherokee, as well as kitchen tiles, mud, grout, paint and paint supplies.

5.20    LPS Field Services refused to return the missing property, to reimburse her, or to repair the damaged property.

5.21    To date, LPS Field Services has not repaired the damage it caused to the Britton Property and has not reimbursed her for the costs to repair such damage or the lost rental value during the time she was denied the full use and enjoyment of her real and personal property.

5.22    LPS Field Services has not returned or paid for the personal property it removed from the Britton Property.

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

5.23    The exact value of the personal property converted from the Britton Property is unknown at this time, but is believed to exceed $1,000.

5.24    The exact value of the damage to the Britton Property is unknown at this time, but multiple doors and locks suffered damage and the bathroom sustained significant damage.

5.25    The exact value of the precluded rents arising from the denial of the full use and enjoyment of the real and/or personal property is unknown at this time.

5.26    On information and belief, LPS Field Services charged its client and received fees and/or profited from the pre-foreclosure actions it took upon the Britton Property. LPS Field Services is liable in restitution for the ill-gotten profits received as a result of its unlawful actions. The exact value of this profit is unknown at this time, but is believed to exceed $100.

5.26    On information and belief, the actions and inactions alleged above are part of LPS Field Services' common business acts and practices.

## VI.    PROPRIETY OF CLASS ACTION PROSECUTION

### *Proposed Class Definition*

6.1    The members of the proposed Class include all Citizens of Washington State:

(a) who own or owned real property in Washington State subject to a loan that was in default;

(b) which property, within the applicable statute of limitations, was entered upon by LPS Field Services and/or its agents prior to the completion of any

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 19
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

judicial or non-judicial foreclosure; and

(c) which entry upon the property by LPS Field Services was the proximate cause of damage to the homeowner by:

(i)    damaging the homeowner's real or personal property; and/or

(ii)    converting the homeowner's personal property or belongings; and/or

(iii)    interfering with the homeowner's full use and enjoyment of the home.

### *CR 23(a)(1): Numerosity*

6.2    The exact number of persons and/or entities similarly situated to the Representative Plaintiff is currently unknown.

6.4    However, LPS Field Services holds itself out as one of the largest mortgage field services company in the country.

6.5    For these reasons, it is estimated that the number of persons similarly situated to the Representative Plaintiff number in the tens of thousands; therefore, joinder of each individual proposed Class Member is impracticable.

6.6    The exact number of persons similarly situated to the Representative Plaintiff may be identified from LPS Field Services' records of residences serviced in Washington State during the applicable statute of limitations, and such persons may be identified with particularity through appropriate judicial discovery procedures, such that it would be possible

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

to give such persons actual notice of these proceedings, if required.

### *CR 23(a)(2): Commonality*

6.7    There are questions of law and fact common among the claims of the proposed Class Members, including but not limited to:

(a) the common actions LPS Field Services takes on the proposed Class Members' properties prior to completion of foreclosure;

(b) LPS Field Services' common policies or practices vis-à-vis actions it takes upon the proposed Class Members' properties;

(c) LPS Field Services' common policies or practices for hiring agents to perform the actions it takes upon the proposed Class Members' properties;

(d) The manner in which LPS Field Services instructs or trains it agents that take action upon the proposed Class Members' properties;

(e) The level of supervision offered by LPS Field Services over its agents who take action on the proposed Class Members' properties; and

(f) The actions LPS Field Services has taken after the *Jordan* decision to restore exclusive possession to each Class Member prior to the completion of foreclosure.

6.8    Additional common questions of law and fact are addressed below under *CR 23(b)(3): Predominance.*

### *CR 23(a)(3): Typicality*

COMPLAINT FOR CLASS ACTION AND DAMAGES
Page 21
4245199

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

6.9     The claims of the Representative Plaintiff are typical of the claims of the Class.

6.10     Plaintiff owned the Britton Property at the time it was entered upon by LPS Field Services.

6.13     As such, Representative Plaintiff and all Members of the Class own or owned real property in Washington State, who, prior to completion of any judicial or non-judicial foreclosure, had their property entered upon by LPS Field Services or its agents for purposes of conducting preservation services upon their property, had their real or personal property located thereon damaged and/or removed by LPS Field Services or its agents, and were denied the full use and enjoyment of their real and/or personal property by LPS Field Services or its agents.

6.14     As a result, Representative Plaintiff and all putative Class Members have been damaged by LPS Field Services' actions, which actions constitute common violations of laws enacted for the protection of Washington State citizens.

6.15     Furthermore, LPS Field Services' defenses to the claims of Representative Plaintiff and the proposed Class Members will be identical due to: (i) LPS Field Services' reliance on a form of deed of trust provision purporting to allow so-called preservation services; and (ii) LPS Field Services' common policies and practices vis-à-vis its retention and supervision of vendors, performance of preservation services, scope of preservation services performed, its response to consumer complaints, and its response to borrower requests for repair to and return of their property and requests for restoration of full and

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

unfettered access to their property.

6.16    In short, because all claims implicate common facts and questions of law, LPS Field Services' defenses will too.

### *CR 23(a)(4): Adequacy of Representation*

6.16    Representative Plaintiff will fairly and adequately protect the interests of the Class.

6.16.1 Representative Plaintiff comes before this Court as an owner of Property that has been trespassed upon, damaged, converted, and interfered with.

6.16.2 Representative Plaintiff is in the same capacity as any other litigant seeking redress for grievances and class relief for the harm which has occurred.

6.16.3 Representative Plaintiff does not have any interests which are antagonistic to those of the Class, and she is ready and willing to bring this class action in a representative capacity on behalf of the proposed Class.

6.17    Plaintiff's counsel will fairly and adequately prosecute the case on behalf of the proposed Class.

6.17.1 Attorneys Jeffers, Danielson, Sonn & Aylward, P.S., are experienced trial attorneys who have engaged in extensive trial practice and have considerable experience in all aspects of class action litigation from several other class action cases.

6.17.2 Plaintiff's counsel have the necessary skills, expertise, and competency to adequately represent the Representative Plaintiffs' interests and those of the Class.

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

### *CR 23(b)(2): Injunctive Relief*

6.18   LPS Field Services has acted or refused to act on grounds generally applicable to the Plaintiff and all Class Members, thereby making appropriate final injunctive relief.

6.19   As detailed throughout this Complaint, LPS Field Services or its agents have a common practice of entering upon Washington borrowers' properties without court order or post-default consent for purposes of conducting property preservation services thereupon, damaging or removing borrowers' real and/or personal property located therein, and denying borrowers the full use and enjoyment of their real and/or personal property.

6.20   On information and belief, LPS Field Services further has a common practice of not adequately training and supervising its agents in the performance of so-called property preservation services, and even instructing its agents to perform certain destructive and disruptive acts.

6.21   LPS Field Services further has a common practice of not repairing, replacing, or reimbursing borrowers when they report property damage as a result of the above acts.

6.22   LPS Field Services also has a common practice of not removing (or affirmatively offering to remove) its locks, lockboxes, and hasps prior to the completion of any foreclosure that it installed on borrowers' properties without post-default consent, even after the *Jordan v. Nationstar Mortg., LLC* decision.

6.22   LPS Field Services also has a common practice of charging fees to and receiving fees from its clients and therefore profiting from its common, above-described

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

1  actions.

2  6.22   LPS Field Services has acted in such manners as applicable to Representative
3
4  Plaintiff and all Class Members.

5  6.23   For these reasons, Representative Plaintiff seek class-wide injunctive relief
6  against LPS Field Services to restrain and enjoin these behaviors.

7  ### CR 23(b)(3): Predominance
8
9  6.24   "Considering whether questions of law or fact common to class members
10  predominate' begins, of course, with the elements of the underlying cause of action."
11  *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) (quoting *Erica P. John*
12  *Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184 (2011)).
13
14  6.25   "A plaintiff class need not prove that each element of a claim can be
15  established by classwide proof[.]" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab.*
16  *Litig.*, 722 F.3d 838, 858 (6th Cir. 2013).

17  6.26   Rather, the Court should "balance against the issues requiring individualized
18
19  proof, any questions of law or fact common to . . . class members . . . ." *Kelly v. Microsoft*
20  *Corp.*, 2010 WL 3556196, at *1 (9th Cir. Sept. 14, 2010) (quoting *In re Wells Fargo Home*
21  *Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009): "it is reversible error to 'rely[]
22  on [one factor] to the near exclusion of other factors relevant to the predominance inquiry'").
23
24  6.27   Thus, certification is appropriate unless individual questions "*overwhelm*
25  questions common to the class." *Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, ---
26

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

U.S. ---, 133 S.Ct. 1184, 1193, 1196, 1204, 185 L.Ed.2d 308 (2013) (emphasis added).

6.28    Numerous legal and factual questions pertaining to the proposed Class Members predominate over any questions affecting only individual members, including but not limited to the following:

6.28.1 <u>Form Contract Provisions.</u>  The Plaintiff will be able to establish the elements of the claims using evidence common to the Class because LPS Field Services derives its purported authority to enter upon borrowers' properties from unlawful form contract provisions applicable to all borrowers' properties.  These contract provisions are substantively identical in all cases.  All such substantively identical form deed of trust provisions were declared on July 7, 2016, to be "in direct conflict with state law and . . . unenforceable" by the Washington Supreme Court in *Jordan v. Nationstar Mortgage*. <u>Exhibit A</u> at p. 20.  Such provisions are common to all putative Class Members and do not involve individualized inquiries.

6.28.2 <u>The Identity of the Property Owner.</u>  Still another element subject to common proof is the identity of the property owner.  As the proposed Class concerns only those properties entered upon by LPS Field Services prior to completion of any judicial or non-judicial foreclosure, there are no individual questions concerning the identity of the rightful property owner—*the borrower* owned the property at the time of entry, not anyone else.  This is further detailed in the *Jordan v. Nationstar Mortgage* opinion, in which the Washington Supreme Court reaffirmed the borrower's right to exclusive possession of the

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

property prior to the completion of any foreclosure proceedings. Exhibit A.

6.28.3 LPS Field Services' Relationship with its Vendors. The Plaintiff will be able to establish the elements of the claims using evidence common to the Class because the primary inquiries involve *LPS Field Services'* conduct. That is, LPS Field Services has a common policy and practice of training and instructing its agents to enter properties prior to completion of any foreclosure. LPS Field Services further instructs its agents to use whatever means necessary to enter properties, including drilling out the borrower's locks, and, once inside, agents are trained and instructed to, *inter alia,* "trash out" the premises by taking and carrying away personal property found therein. Thus, evidence common to all Members of the Class includes: LPS Field Services' selection of vendors and screening of employees; LPS Field Services' training of vendors; LPS Field Services' instructions to its vendors; and LPS Field Services' oversight of its vendors' work. This theory is common to all putative Class Members and does not involve individualized inquiries.

6.28.4 The Conduct of LPS Field Services' Vendors in Entering and Damaging or Converting Borrowers' Property. The Plaintiff will be able to establish the elements of all claims using evidence common to the Class because, as to all putative Class Members, LPS Field Services' vendors acted similarly while on borrowers' properties; namely, they committed unauthorized entry upon borrowers' properties, conducted unlawful forcible entries involving damage to existing locks, doors and/or windows, damaged and converted personal property found thereon, and interfered with borrowers' full use and

enjoyment of their property. This theory is common to all putative Class Members and does not involve individualized inquiries.

6.28.5 <u>LPS Field Services' Policies and Procedures for Responding to Customer Complaints.</u> The Plaintiff will be able to establish the elements of the claims using evidence common to the Class because LPS Field Services' policies and procedures for responding to customer complaints of its agents' entry, conversion of borrowers' property, and interference with borrowers' full use and enjoyment of their property are the same in all cases. That is, LPS Field Services does not immediately restore possession of the property to the owner, does not return or replace the property's original locks, does not remove its locks from the property upon demand, did not offer to or remove its locks from the property after the *Jordan* decision, and does not return or replace personal property removed from the property. These facts are common to all putative Class Members and do not involve individualized inquiries.

6.28.6 <u>Class Members' Damages.</u> The Plaintiff will be able to establish the elements of the claims using evidence common to the Class because all putative Class Members suffered the same type of damage; namely, injury to real and/or personal property from LPS Field Services' forcible entry, damage to, and/or conversion of personal property, and interference with the full use and enjoyment of the property by the borrower. The Plaintiff will also be able to establish LPS Field Service's liability in restitution to the Class for profits it received as a result of its above-described unlawful conduct, using evidence

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

common to the Class because LPS Field Service's fee, payment, and profit policies and procedures are common to the Class. These facts are common to all putative Class Members and will not require individualized inquiries.

6.29    As a result, the prosecution of a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

6.30    Individual actions are not likely to seek sufficient damages to warrant assuming the cost of litigation. Here, the damages sustained by each putative Class Member are not large, generally including damage to doors, windows, and/or personal property within the residence, as well as the fair rental value of each putative Class Member's home during the time in which LPS Field Services interfered with the putative Class Member's exclusive right to possession, and the ill-gotten profits that LPS Field Services must disgorge from the activities unlawfully conducted on each putative Class Member's property. Therefore, each putative Class Member will have difficulty maintaining an individual action, and a class action is a superior method to adjudicate their claims.

6.31    In addition, tens of thousands of individual actions would greatly congest the Washington State courts.

6.32    A class action is the most cost-effective way for consumers to prevent future economic and pecuniary loss to tens of thousands of Washington citizens and members of the public at large by LPS Field Services.

6.33    This action is superior to any other available method for the fair and efficient

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

adjudication of the controversy.

## VII.    FIRST CAUSE OF ACTION:
## VIOLATION OF CONSUMER PROTECTION ACT (RCW 19.86, *et seq.*)

7.1    LPS Field Services Engaged in Unfair or Deceptive Acts and Practices.

7.1.1    The following actions of LPS Field Services constitute unfair *and* deceptive acts and practices for the purposes of RCW 19.86, *et seq.*: LPS Field Services' common practices of unlawfully entering borrowers' properties in advance of the conclusion of any foreclosure proceedings; forcible entries via drilling out existing door locks; keeping the locks; damaging doors and windows, removing personal property; refusing to refund, repair, or compensate for damage caused and property taken; denying owners or legal occupants the full use and enjoyment of their real and/or personal property; failing to respond or timely respond to demands for repairs, return of property, and access to their property; failing to restore exclusive possession to putative Class Members' properties even after the *Jordan* decision; and profiting from the above-described unfair and deceptive acts.

7.1.2    These acts are unfair because the Washington Supreme Court in *Jordan v. Nationstar Mortgage* deemed such practices a clear violation of Washington state law, and the deed of trust provisions purporting to authorize them unenforceable as contrary to law. These acts are further unfair because of the unequal bargaining power between the individual homeowner or occupant and a large, national company that forcibly enters properties, drills out the existing locks, places its own locks on the properties, interferes with owners' or legal occupants' full use and enjoyment of the properties, converts personal property located upon

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P.O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

the properties, and refuses to return or replace damaged or converted property to the rightful owner. And these acts are also unfair because they allowed LPS Field Services to profit from engaging in unlawful and damaging conduct on borrowers' homes.

7.1.3    These acts are deceptive because when LPS Field Services performs them, the property owner is unaware that they are occurring, and such acts are not authorized via any form deed of trust provision. Further, by changing a putative Class Member's locks, and by posting certain notices on the property, LPS Field Services communicates wrongfully that the putative Class Member is no longer entitled to the exclusive possession of his or her home.

7.1.4    LPS Field Services engaged in similar unfair and deceptive acts and practices vis-à-vis other Washington borrowers.

7.2    LPS Field Services' Acts Occurred in Trade or Commerce.    LPS Field Services' unfair and deceptive acts occurred in trade or commerce because LPS Field Services is one of the largest mortgage field services company in the country and was servicing the properties at the time of the challenged acts.

7.3    LPS Field Services' Acts Impact the Public Interest.

9.3.1    LPS Field Services' unfair or deceptive acts impacted the public interest because they were committed in the course of LPS Field Services' business, LPS Field Services advertises similar services to the public in general, and LPS Field Services and Plaintiff and putative Class Members (as individual consumers) occupy unequal bargaining

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O. Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

positions.

7.3.2    LPS Field Services engages in a course of conduct whereby the same or similar unfair or deceptive acts are repeated as to borrowers across Washington State.

7.3.3    There exists a real and substantial potential for repetition of LPS Field Services' conduct in the future because LPS Field Services is one of the largest mortgage field services company in the country, and LPS Field Services has not, to date, removed (or affirmatively offered to remove) its locks, lockboxes, and hasps that continue to exist on borrowers' properties prior to the completion of any foreclosure, which were installed without court order or post-default borrower consent.

7.4    Causation.

7.4.1    Causation is satisfied through the common proof that LPS Field Services' policy and practice is to instruct its agents to enter borrowers' homes, to do so forcibly, to remove personal property therefrom, and to place and maintain its own locks and lock boxes on borrowers' properties.

7.4.2    These common instructions proximately cause borrowers' damages because, *but for* LPS Field Services' instructions to its agents, there would be no entry, conversion, or interference resulting in damage to borrowers.

7.5    Injury to Business or Property.    As a direct and proximate result of LPS Field Services' unfair or deceptive acts as set forth above, Plaintiff suffered injury to her property in an amount to be proven at trial.    Putative Class Members suffered similar injuries.

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

7.6    LPS Field Services' above-listed unfair or deceptive acts constitute violations of RCW 19.86, *et seq.*

7.7    LPS Field Services is liable to Plaintiff for treble the amount of her damages, including those arising from the interference with the full use and enjoyment of her real property and/or personal property, caused by the violations of RCW 19.86, *et seq.*

7.8    LPS Field Services is liable to Plaintiff for her reasonable attorneys' fees and costs pursuant to RCW 19.86, *et seq.*

7.9    LPS Field Services is similarly liable to the countless Washington borrowers who experienced the same or similar wrongs as the Representative Plaintiff.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and on behalf of others similarly situated, demands judgment against LPS Field Services as follows:

1.    For entry of a judgment in favor of Plaintiff against LPS Field Services for damages in an amount to be proven at trial, including treble damages pursuant to RCW 19.86.090, and/or other applicable law;

2.    For entry of a judgment in favor of Plaintiff and against LPS Field Services for reasonable attorneys' fees and costs pursuant to RCW 19.86.090, and/or other applicable law;

3.    For injunctive relief restraining LPS Field Services from further violation of RCW 19.86, *et seq.*, as alleged herein; and

4.    For such other and further relief as the Court deems just and equitable

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

1

2

3
DATED this 29th day of December, 2017.

4                                                     By:
                                                     CLAY M. GATENS, WSBA No. 34102
5                                                     DEVON A. GRAY, WSBA No. 51485
                                                     JEFFERS, DANIELSON, SONN & AYLWARD, P.S.
6                                                     2600 Chester Kimm Road
                                                     P.O. Box 1688
7                                                     Wenatchee, WA 98807-1688
                                                     Telephone: 509-662-3685
8                                                     Fax: 509-662-2452
                                                     Email: ClayG@jdsalaw.com
9                                                               DevonG@jdsalaw.com
                                                     Attorneys for Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Jeffers, Danielson, Sonn & Aylward, P.S.
Attorneys at Law
2600 Chester Kimm Road / P O Box 1688
Wenatchee, WA 98807-1688
(509) 662-3685 / (509) 662-2452 FAX

# EXHIBIT A

FILE
IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUL 0 7 2016
CHIEF JUSTICE

This opinion was filed for record
at 9:00 am on MAY 7 2016

Susan L. Carlson
Attorney
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WASHINGTON IN | No. 92081-8 |
| LAURA ZAMORA JORDAN, as her separate estate, and on behalf of others similarly situated, | En Banc |
| Plaintiff, | Filed JUL 0 7 2016 |
| v. | |
| NATIONSTAR MORTGAGE, LLC, a Delaware limited liability company, | |
| Defendant. | |

OWENS, J. — After defaulting on her home mortgage payment, plaintiff Laura Jordan returned home from work one evening to discover she could not enter her own house: the locks had been changed without warning. A notice informed her that in order to gain access to her home, she must call defendant Nationstar Mortgage LLC to obtain the lockbox code and retrieve the new key inside. Although she

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

eventually reentered her home, she removed her belongings the next day and has not

returned since. Jordan's home loan was secured by a deed of trust, a commonly used

security instrument that was created as an alternative to traditional mortgages to

provide for a simpler method of foreclosure. The deed of trust contained provisions

that allowed Nationstar to enter her home upon default without providing any notice

to the homeowner. Today, we are asked to decide whether those provisions conflict

with Washington law.

Jordan represents a class action proceeding in federal court, which has certified

two questions to us. The first question asks whether the deed of trust provisions

conflict with a Washington law that prohibits a lender from taking possession of

property prior to foreclosure. We hold that it does because the provisions allow

Nationstar to take possession of the property after default, which conflicts with the

statute. The second question asks whether Washington's statutory receivership

scheme—providing for a third party to possess and manage property in lieu of either

the lender or homeowner—is the exclusive remedy by which a lender may gain access

to the property. As explained below, we hold nothing in our law establishes the

receivership statutes as an exclusive remedy.

## FACTS

In 2007, Jordan bought a home in Wenatchee, Washington, with a home loan of

$172,000 from Homecomings Financial. She secured the loan by signing a deed of

2

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

trust. The original lender assigned the loan to the Federal National Mortgage

Association (Fannie Mae), one of the nation's largest mortgagees that primarily

participates in the secondary mortgage market, which hired Nationstar to service the

loan.

Jordan went into default on her mortgage payments in January 2011. In March

2011, one of Nationstar's vendors came to Jordan's home and changed the locks on

her front door. Jordan returned home to find a notice on the front door informing her

that the property was found to be "unsecure or vacant" and that to protect her and the

mortgagee's interest in the property, it was "secured against entry by unauthorized

persons to prevent possible damage." Order Certifying Questions to Wash. Supreme

Ct., *Jordan v. Nationstar Mortg., LLC*, No. 2:14-CV-0175-TOR at 6 (E.D. Wash.

Aug. 10, 2015). While the above-noted facts are undisputed, the parties dispute

whether the home was vacant. Jordan contends she was living there, left for work that

morning as usual, and returned to find the lockbox and notice. On the other hand,

Nationstar contends that its vendor performed an inspection of the property and

determined it was vacant.

Upon finding the notice when she returned home, Jordan called the phone

number provided and got the key from the lockbox to reenter her home. She took all

of her belongings and vacated the house the next day. Since then, Nationstar's vendor

has maintained the property's exterior and winterized the interior. Nationstar does not

3

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

claim to have attempted to provide Jordan any notice of its intention to inspect the property and rekey it. Nationstar contends that its usual practice is to change the locks on only one door, such that it can access the home in the future, but also so that the owner can still enter the home through another door. Here, Jordan's home had only a front door and a sliding glass door in the rear of the home. Therefore, when Nationstar's vendor rekeyed the front door, she had no means of entry.

Jordan represents a certified class of 3,600 Washington homeowners who were locked out of their homes pursuant to similar provisions in their deeds of trust with Nationstar. This case presents an important issue for these homeowners and the thousands of others subject to similar provisions, as well as the many mortgage companies that have a concern with preserving and protecting the properties in which they have an interest. Three amicus briefs were filed in this case: Federal Home Loan Mortgage Corporation (Freddie Mac) and the city of Spokane supporting defendant Nationstar, and the Northwest Consumer Law Center supporting plaintiff Jordan. Freddie Mac tells us that the provisions such as the ones at issue here are important to the foreclosure process because they allow lenders to enter the property to maintain and secure it. It contends that such provisions help meet Freddie Mac's requirements it imposes on companies like Nationstar to preserve properties.

In April 2012, Jordan filed a complaint against Nationstar in Chelan County Superior Court, alleging state law claims that include trespass, breach of contract, and

4

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

violations of the Washington Consumer Protection Act and the Fair Debt Collection

Practices Act. Ch. 19.86 RCW; 15 U.S.C. §§ 1692-1692p. Chelan County Superior

Court certified the class action, with Jordan as the representative for the 3,600

similarly situated homeowners. Nationstar removed the action to the United States

District Court for the Eastern District of Washington (District Court). The parties

each filed motions for partial summary judgment. Nationstar asked the District Court

to find the provisions at issue enforceable under Washington law. Jordan asked the

District Court to find that before the lender can enter a borrower's property, the lender

must obtain either the borrower's postdefault consent or permission from a court.

Furthermore, Jordan contends that receivership is the only remedy by which a lender

may gain access to the borrower's property. Finding that the case raised unresolved

questions of Washington state law, the District Court certified two questions to us.

We accepted the following certified questions.

## CERTIFIED QUESTIONS

1.    Under Washington's lien theory of mortgages and RCW 7.28.230(1), can

a borrower and lender enter into a contractual agreement prior to default that allows the

lender to enter, maintain, and secure the encumbered property prior to foreclosure?

2.    Does chapter 7.60 RCW, Washington's statutory receivership scheme,

provide the exclusive remedy, absent postdefault consent by the borrower, for a lender

to gain access to an encumbered property prior to foreclosure?

5

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

ANALYSIS

Certified questions present questions of law and we review them de novo. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist., No. 1*, 149 Wn.2d 660, 670, 72 P.3d 151 (2003).

    1. *Washington's Lien Theory and RCW 7.28.230(1) Prevent a Borrower and a Lender from Contracting To Allow the Lender To Take Possession Based on Borrower Default*

The District Court asks us to determine whether a predefault clause in a deed of trust that allows a lender to enter, maintain, and secure the property before foreclosure is enforceable. We must determine whether these provisions contravene Washington law. As described below, the deed of trust provisions authorize a lender to enter the borrower's property after default. The parties agree that a Washington statute prohibits a lender from taking possession of a borrower's property prior to foreclosure. The controversial issue here is whether the deed of trust provisions allowing the lender to enter constitute taking possession prior to foreclosure, such that they conflict with state law. Based on Nationstar's practices, we find that the provisions do allow the lender to take possession and thus they are in conflict with state law. As such, we answer the first certified question in the negative.

    a. *The Deed of Trust Provisions Allow a Lender To Enter the Borrower's Property upon Default or Abandonment*

"[I]t is the general rule that a contract which is contrary to the terms and policy of an express legislative enactment is illegal and unenforcible [sic]." *State v. Nw.*

6

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

*Magnesite Co.*, 28 Wn.2d 1, 26, 182 P.2d 643 (1947). While we recognize an

overarching freedom to contract, provisions are unenforceable where they are

prohibited by statute. *State Farm Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477, 481, 687

P.2d 1139 (1984).

The provisions at issue are made up of two sections in the deed of trust. The

first provision, in pertinent part, is as follows:

> 9.    **Protection of Lender's Interest in the Property and Rights
> Under this Security Instrument**. If (a) Borrower fails to perform the
> covenants and agreements contained in this Security Instrument, . . . or
> (c) Borrower has abandoned the Property, then Lender may do and pay
> for whatever is reasonable or appropriate to protect Lender's interest in
> the Property and rights under this Security Instrument, including
> protecting and/or assessing the value of the Property, and securing
> and/or repairing the Property. . . . Securing the Property includes, but is
> not limited to, entering the Property to make repairs, change locks,
> replace or board up doors and windows, drain water from pipes,
> eliminate building or other code violations or dangerous conditions, and
> have utilities turned on or off. Although Lender may take action under
> this Section 9, Lender does not have to do so and is not under any duty
> or obligation to do so.

Ex. 19, at 8. The provisions also allows the lender to "make reasonable entries upon

and inspections of the Property" where the lender has reasonable cause and gives the

borrower notice. *Id.* at 7. It also requires the borrower to maintain and protect the

property. *Id.*

Together, these sections are the so-called "entry provisions" that are at issue in

this case, which allow the lender to enter, maintain, and secure the property after the

borrower's default or abandonment. Nationstar hinges its argument on the need to

7

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

secure abandoned property, stating it does not enter occupied property. However, the provision plainly states that the lender may "secure" the property after the borrower defaults *or* abandons the property. The provision specifically lists changing the locks as a method of securing the property. Thus, the provisions authorize the lender to enter and rekey the property solely upon default, regardless of whether the borrower has abandoned the property.

As explained below, it is well settled that Washington law prohibits lenders from taking possession of borrowers' property before foreclosure. This question turns on whether the above provisions authorize lenders to "take possession" and if, in fact, the lender's actions here constituted taking possession.

> b. *Washington's Lien Theory Does Not Permit a Lender To Take Possession of Property Prior to Foreclosure*

Our case law is clear that Washington law prohibits a lender from taking possession of property before foreclosure of the borrower's home. Importantly, the parties agree on this point; under state law, a secured lender cannot gain possession of the encumbered property before foreclosure.

RCW 7.28.230 provides that

> (1)    A mortgage of any interest in real property shall not be deemed a conveyance so as to enable the owner of the mortgage to recover possession of the real property, without a foreclosure and sale according to law.[1]

---

[1] Before 1969, this section of the statute ended after "without a foreclosure and sale according to law." CODE OF 1881, § 546. It was amended in 1969 to make clear that the statute should not be

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

This statute essentially codified Washington's lien theory of mortgages. The mortgage lien theory prevails in Washington, meaning that the mortgage is seen as "nothing more than a lien upon the property to secure payment of the mortgage debt, and in no sense a conveyance entitling the mortgagee to possession or enjoyment of the property as owner." *W. Loan & Bldg. Co. v. Mifflin*, 162 Wash. 33, 39, 297 P. 743 (1931). We have interpreted RCW 7.28.230(1) to mean that a mortgagor's default does not disrupt the mortgagor's right to possession of real property, and that the mortgagor retains the right to possession until there has been foreclosure and sale of the property. *Howard v. Edgren*, 62 Wn.2d 884, 885, 385 P.2d 41 (1963).

The *Restatement (Third) of Property* takes the approach that mortgagee possession agreements conflict with lien theory statutes. *See* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 4.1 cmt. b (AM. LAW INST. 1997). Several lien theory jurisdictions hold that provisions that allow the lender to take possession of the property contravenes public policy that is inherent to the lien theory; indeed, some states have even codified statutes that specifically invalidate such agreements. *See, e.g.*, COLO. REV. STAT. ANN. § 38-35-117; IDAHO CODE ANN. § 6-104; NEV. REV. STAT. § 40.050; OKLA. STAT. ANN. tit. 42, § 10; UTAH CODE ANN. § 78B-6-1310.

_____

interpreted to prohibit a mortgagee from collecting rents before foreclosure. *See* LAWS OF 1969, 1st Ex. Sess., ch. 122, § 1; *and see Kezner v. Landover Corp.*, 87 Wn. App. 458, 464, 942 P.2d 1003 (1997). However, the bedrock principle that borrowers have a right to possession prior to foreclosure was not altered by the amendment.

9

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

Washington's legislature, however, did not specifically invalidate such contrary agreements in its codification of lien theory prohibiting the lender from taking possession of property before foreclosure. That the legislature did not specifically invalidate such contract provisions, as did other states, does not mean the provisions do not conflict with our laws. Thus, we must determine whether its statute is in conflict with such an agreement.

Nationstar concedes that the borrower's right to possession cannot be overcome by a contrary provision in the mortgage or deed of trust because such a provision would be unenforceable as it would contravene Washington law. Def.'s Answering Br. at 11. However, Nationstar argues that the entry provisions do not authorize the lender to take "possession" and that its specific conduct at Jordan's residence did not constitute possession. Therefore, the determinative issue in answering this first certified question is whether the entry provisions cause the lender to gain "possession." As explained below, the entry provisions do authorize conduct that constitutes "possession."

### c. *These Entry Provisions Allow a Lender To Take Possession Prior to Foreclosure and Therefore Conflict with State Law*

We must determine if the entry provisions authorize the lender to take "possession" of the property. If they do, the provisions are in conflict with Washington law. Here, we look to the actions that Nationstar took pursuant to the entry provisions to see if they constituted "possession." Possession has slightly

10

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

different meanings in different areas of the law. The parties supplied definitions from real property law, tort law, and landlord-tenant law because it is unclear which definition is applicable to RCW 7.28.230(1).

Under any definition, the conduct allowed under the entry provisions constitutes possession because Nationstar's actions satisfy the key element of possession: control. In property law, "possession" is defined as "a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of society in general from any present occupation of the land." RESTATEMENT (FIRST) OF PROP.: DEFINITION OF CERTAIN GENERAL TERMS § 7(a) (AM. LAW INST. 1936).

The key element to the property definition of "possession" is the "certain degree of physical control." Tort law similarly requires control. In tort law, which is concerned primarily with liability, a "possessor of land" is defined as "a person who occupies the land and controls it." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 49 (AM. LAW INST. 2012).

The Court of Appeals applied the tort definition of possession when it considered the phrase "mortgagees in possession" for purposes of premises liability. *Coleman v. Hoffman*, 115 Wn. App. 853, 858-59, 64 P.3d 65 (2003). There, the lender used RCW 7.28.230(1) as a defense to its putative possession to avoid liability, arguing that it could not have been "in possession" because the statute forbids it. *Id.*

11

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

at 863.  The court relied on the above tort definition of "possession" and another

prominent source that stated for a lender to be liable, it must "'exercise dominion and

control over the property.'"  *Id.* at 859 (quoting 62 AM. JUR. 2D *Premises Liability*

§ 8, at 356 (1990)).  In finding that the plaintiff showed enough facts of lender's

possession, the court pointed to the lender's repairs and payments of utility bills.  *Id.*

at 862-63.

　　We also find that landlord-tenant law's treatment of "possession" helpful—

particularly its analysis of the impact of changing locks.  In *Aldrich v. Olson*, the

Court of Appeals found that when the landlord changed the locks of her tenant's

home, it was an unlawful eviction.  12 Wn. App. 665, 672, 531 P.2d 825 (1975).  The

court reasoned, "It is difficult to visualize an act of a landlord more specifically

intended as a reassumption of possession by the landlord and a permanent deprivation

of the tenant's possession than a 'lockout' without the tenant's knowledge or

permission."  *Id.* at 667.

　　From any approach, we find that Nationstar's conduct constituted possession.

The foregoing possession definitions, as well as *Coleman* and *Aldrich*, are instructive.

Nationstar's vendor's actions constituted possession because its actions are

representative of control.  The vendor drilled out Jordan's existing locks and replaced

the lock with its own.  Nationstar stated in its brief that it rekeyed Jordan's property to

allow itself access to return to secure the property by winterizing it and to make

12

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

repairs. Def.'s Answering Br. at 33-34. Perhaps that is true; however, rekeying the

property also had the effect of communicating to Jordan that Nationstar now

controlled the property. The action left Jordan with no method of entering her own

property. Nationstar relies on the fact that it did not change the locks to exclude

Jordan (because it provided her a lockbox and phone number to call) to provide proof

that it did not possess the premises. However, although she was able to obtain a key

by calling, the process made Nationstar the "middle man." She could no longer

access her home without going through Nationstar. This action of changing the locks

and allowing her a key only after contacting Nationstar for the lockbox code is a clear

expression of control. Although Nationstar did not exclude Jordan from the premises

(as she was able to gain a key and enter), she left the next day and did not return. In

its amicus brief, the Northwest Consumer Law Center advised us anecdotally that

many similarly situated Washington homeowners felt that when the lender changed

the locks to their homes, they no longer had a right to continue to possess the

property. *See* Br. of Amicus Curiae Nw. Consumer Law Ctr. at 6.

Nationstar effectively ousted Jordan by changing her locks, exercising its

control over the property. Although the mortgagee-mortgagor context is different

from the landlord-tenant context, *Aldrich* provides an apt analogy here because the

court there found that changing the tenant's locks was the most striking showing of a

reassumption of possession. 12 Wn. App. at 667. Changing the locks is akin to

13

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

exercising control, which is the key element of possession. By changing the locks, Nationstar took possession of the property. Since these actions are authorized by the entry provisions, the entry provisions allow the lender to take possession of the property. Because Washington law prohibits lenders from taking possession of the borrower's property before foreclosure, the provisions are in conflict with state law. Therefore, we must answer the first certified question in the negative and find that the entry provisions are unenforceable.

### 2. Chapter 7.60 RCW Does Not Provide the Exclusive Remedy for a Lender To Gain Access to an Encumbered Property Prior to Foreclosure

The second certified question asks whether this state's receivership statutes separately prohibit the entry provisions. Specifically, this second question asks whether chapter 7.60 RCW, which provides for the judicial appointment of a third party receiver to manage the property, is the exclusive method by which lenders can gain access to encumbered property prior to foreclosure.

This is an issue of first impression in this court, and no Washington appellate decision is on point. We must answer this question in the negative because nothing indicates that the statutory receivership scheme provides the exclusive remedy for lenders to access a property.

### a. Background on Receivership and Its Role in Mortgage Foreclosure

Chapter 7.60 RCW governs Washington's receivership scheme. A "receiver" is a third party appointed by a court to take charge of property and manage it as the

14

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

court directs. 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON

PRACTICE: REAL ESTATE: TRANSACTIONS, § 18.6, at 310 (2d ed. 2004). The statutes

enumerate some 40 circumstances under which a receiver may be appointed. Only a

few concern mortgaged real property. *See* RCW 7.60.025(1)(b), (g), (cc), (dd).

Although authorized by statute, lenders are not *entitled* to a receiver, even where a

clause in the mortgage provides for the appointment of a receiver. STOEBUCK &

WEAVER, *supra*, § 18.6, at 312. While statutory grounds exist for a court-appointed

receiver prior to foreclosure, it is rarely sought. *Id.* at 314.

In the context of mortgaged real property, a receiver might be appointed as a

"custodial receiver," who would take possession of the property and preserve it.

RCW 7.60.015; 7.60.025(1)(g). Commonly, receivers are appointed to collect rent

from income-producing property. STOEBUCK & WEAVER, *supra*, § 18.6, at 310-11;

*see* RCW 7.28.230(1) (providing grounds for appointing a receiver to collect rent for

application to mortgage). Importantly, nothing in the text of RCW 7.28.230(1) or

chapter 7.60 RCW requires the appointment of a receiver in this context.

Jordan argues that the entry provisions are Nationstar's attempt to contract

around chapter 7.60 RCW's requirements and that the legislature intended for the

statutes to provide lenders an exclusive remedy. However, as explained below,

Jordan's arguments fail to establish that chapter 7.60 RCW does so.

15

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

### b.  *The Contract Provisions Do Not Conflict with Chapter 7.60 RCW*

We have held that the deed of trust act in chapter 61.24 RCW cannot be contracted around in two recent cases where parties attempted to modify the deed of trust act's requirements by private contract. *See Bain v. Metro. Mortg. Grp., Inc.*, 175 Wn.2d 83, 107, 285 P.3d 34 (2012) (holding that parties cannot contract to fit a statutory definition to fulfill the act's requirements); *Schroeder v. Excelsior Mgmt. Grp., LLC*, 177 Wn.2d 94, 107, 297 P.3d 677 (2013) (holding that parties cannot contractually waive a requirement under the act that agricultural properties may only be foreclosed judicially).

Jordan argues that like in *Bain* and *Schroeder*, the entry provisions attempt to "bypass" statutes that dictate a lender's only entry method. Pl.'s Opening Br. at 25. However, Jordan misconstrues the receivership statutes as providing a "list of requisites to a lender gaining access to a borrower's property." *Id.* at 28. While the statutes enumerate receivership requirements, they are not concerned with a lender's access to borrower's property but rather merely set forth requirements *should* a receiver be necessary. Thus, the entry provisions do not attempt to circumvent the receivership statutes and thus do not conflict with chapter 7.60 RCW. Similarly, Jordan's other arguments do not support her contention that the receivership statutes provide lenders an exclusive remedy to access property. In fact, as explained below,

16

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

the text of the statute and policy considerations support a finding that chapter 7.60

RCW does not provide lenders the exclusive remedy.

     *c.   The Statute's Text Supports Finding That It Does Not Provide an
        Exclusive Remedy*

     The text of the statute supports a finding that it does not provide the exclusive

remedy. First, the plain language of the statute must be examined to determine

exclusivity. We have held that when engaging in statutory interpretation, our

"fundamental objective is to ascertain and carry out the Legislature's intent, and if the

statute's meaning is plain on its face, then the court must give effect to that plain

meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell &*

*Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

     Of course, an exclusivity clause would be the clearest indication of the

legislature's intent that the statute be exclusive, but as Jordan concedes, this statute

does not have one. However, Jordan argues that because the statutory scheme is

"comprehensive," the legislature intended for the statute to provide the exclusive

remedy for lenders such that they cannot contract for entry otherwise. *See generally*

Pl. Opening Br. at 24-37; *and see* LAWS OF 2004, ch. 165, § 1. It is true that the

receivership statutory scheme is comprehensive, but the plain language of the statute

does not suggest that chapter 7.60 RCW was intended to be an exclusive remedy.

     If a court were to appoint a receiver in this context, it would likely be pursuant

to RCW 7.60.025(1). Thus, we analyze the question of whether the receivership

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

provides lenders the exclusive remedy under that portion of the provision. The statute

provides, in part:

> A receiver *may* be appointed by the superior court of this state in the following
> instances, but except in any case . . . in which a receiver's appointment with
> respect to real property is sought under (b)(ii) of this subsection, a receiver
> *shall* be appointed *only if* the court additionally determines that the
> appointment of a receiver is reasonably necessary and that *other available*
> *remedies* either are not available or are inadequate.

RCW 7.60.025(1) (emphasis added). Subsection (b)(ii) provides that a receiver *may*

be appointed after the commencement of a foreclosure proceeding on a lien against

real property where the appointment is provided for by agreement or is necessary to

collect rent or profits from the property.

In analyzing this text, we look to its plain language. In general, the court's

discretion is illustrated by the word "may." Under subsection (b)(ii), a receiver *shall*

be appointed, but *only if* the court makes additional findings. First the court must find

a receiver is "reasonably necessary." RCW 7.60.025(1)(b)(ii). Second, and more

importantly, the court determines that "*other available remedies* either are not

available or are inadequate." RCW 7.60.025(1) (emphasis added).

Courts consider all of the facts and circumstances to determine whether to

appoint a receiver. *Union Boom Co. v. Samish Boom Co.*, 33 Wash. 144, 152, 74 P.

53 (1903). "It is well established that a receiver should not be appointed if there is

any other adequate remedy." *King County Dep't of Cmty. & Human Servs. v. Nw.*

*Defs. Ass'n*, 118 Wn. App. 117, 126, 75 P.3d 583 (2003) (citing *Bergman Clay Mfg.*

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

*Co. v. Bergman,* 73 Wash. 144, 147, 131 P. 485 (1913)). The Court of Appeals

reasoned that allowing a current board of directors to oversee a corporation "was not

an adequate remedy" and, thus, found that appointment of a receiver was appropriate.

*Id.* at 126.

Thus, in general, other remedies exist outside of appointing a receiver. It is not

before us to determine what particular remedies are available. To answer this

question, it is sufficient that the plain language of the provision does not indicate that

chapter 7.60 RCW was meant to provide an exclusive remedy to lenders. Finally,

public policy also supports the finding that the statute is not the exclusive remedy,

which we discuss below.

### d. *Public Policy Supports Finding That Chapter 7.60 RCW Does Not Provide an Exclusive Remedy*

To the extent that chapter 7.60 RCW's language is not explicit, it is worth

noting a relevant policy consideration. One of the advantages of a deed of trust is that

it offers "'efficient and inexpensive'" nonjudicial foreclosure. *Schroeder,* 177 Wn.2d

at 104 (quoting *Cox v. Helenius,* 103 Wn.2d 383, 387, 693 P.2d 683 (1985)). Thus,

requiring lenders to wade through the judicial receivership process in all cases—

regardless of the facts and circumstances—is illogical. Overall, both policy and the

plain text of the statute support finding that it does not provide an exclusive remedy to

lenders. Thus, we must answer this question in the negative.

19

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

## CONCLUSION

We answer the first certified question in the negative. Washington law prohibits lenders from taking possession of property prior to foreclosure. These entry provisions enable the lender to take possession after default, and the lender's action here constitutes taking possession. Therefore, the entry provisions are in direct conflict with state law and are unenforceable.

As to the second question, we also answer it in the negative. The text of the receivership statutes, the legislative intent behind them, and public policy considerations compel us to find that chapter 7.60 RCW is not the exclusive remedy for lenders to gain access to a borrower's property.

*Jordan v. Nationstar Mortgage, LLC*
No. 92081-8

WE CONCUR:

21

*Jordan v. Nationstar Mortgage, LLC*

No. 92081-8

STEPHENS, J. (dissenting)—I respectfully dissent because the majority erroneously equates the entry provisions at issue with actual possession. Months after Laura Jordan defaulted on her loan, Nationstar Mortgage LLC inspected Jordan's property and determined that it was vacant. Pursuant to the deed of trust's entry provisions, Nationstar secured the home by changing the lock to the front door and posted instructions on how Jordan could enter the home if she returned. This practice is not inconsistent with Washington's lien theory of mortgages and RCW 7.28.230(1). Accordingly, the first certified question should be answered in the affirmative.

"Washington courts have hesitated to 'invoke public policy to limit or avoid express contract terms absent legislative action.'" *Brown v. Snohomish County Physicians Corp.*, 120 Wn.2d 747, 753, 845 P.2d 334 (1993) (quoting *State Farm*

*Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477, 481, 687 P.2d 1139 (1984)). It is undisputed that the deed of trust's entry provisions were contractually agreed to and authorized Nationstar to change the locks on Jordan's home after default. And as the majority correctly notes, Washington's legislature has not "specifically invalidate[d] such contrary agreements in its codification of lien theory prohibiting the lender from taking possession of property before foreclosure." Majority at 10.

The majority nevertheless finds the entry provisions contravene Washington's rule against lenders taking preforeclosure possession of borrowers' property. The majority does so by describing the entry provisions as authorizing the lender to take "possession." *Id.* at 8, 12. But the certified question asks not whether lenders can take "possession" of property before foreclosure. Instead, it asks whether the lender can "enter, maintain, and secure the encumbered property" before foreclosure. Order Certifying Questions to Wash. Supreme Court, *Jordan v. Nationstar Mortg., LLC*, No. 2:14-CV-0175-TOR at 9 (E. Wash. Aug. 10, 2015). Absent legislation stating otherwise, the entry provisions at issue are not inconsistent with Washington's lien theory of mortgages and RCW 7.28.230(1).

The majority cites inapposite authority to equate the entry provisions with actual possession. At the outset, the majority's reliance on the *Restatement* is misplaced. RESTATEMENT (THIRD) OF PROP: MORTGAGES § 4.1 (AM. LAW. INST.

*Jordan v. Nationstar Mortgage, LLC*, 92081-8 (Stephens, J. Dissenting)

1997). The *Restatement* does not contemplate entry provisions, like those considered here, but rather a lender taking possession. The *Restatement* merely reiterates the general rule against accelerated preforeclosure possession of property. In illustrative applications of this rule, the *Restatement* examines instances where the mortgagee has "file[d] an action to obtain possession of [the property]." RESTATEMENT § 4.1 cmt. b, illus. 1-3. Here, however, Nationstar has not filed an action to obtain possession of Jordan's property. Instead, after Jordan defaulted on her loan, Nationstar took contractually authorized steps to secure the abandoned property— and it posted instructions on how Jordan could access the property, consistent with her continued right of possession.

Neither of the two Court of Appeals decisions cited by the majority support equating the entry provisions to possession. *Aldrich v. Olson* does not even interpret "possession" in RCW 7.28.230(1). 12 Wn. App. 665, 531 P.2d 825 (1975). And *Coleman v. Hoffman* merely clarifies the difference between the right to possession (applicable to foreclosure actions) and actual possession (applicable to premises liability matters): "Although RCW 7.28.230 effectively precludes a mortgagee from obtaining possession of property to the mortgagor's exclusion, the statute does not bear on the question of whether a mortgagee actually possess the property. Actual possession, not a right to possession, is the critical inquiry in premises liability

-3-

*Jordan v. Nationstar Mortgage, LLC*, 92081-8 (Stephens, J. Dissenting)

cases." 115 Wn. App. 853, 863-64, 64 P.2d 65 (2003). But unlike the landlords in

*Aldrich* and *Coleman*, Nationstar never possessed the property to Jordan's exclusion.

Rather, Nationstar provided Jordan with instructions on how to enter her home if she

returned. At no point did Nationstar ever object to Jordan's continued right to

possession before foreclosure.

Finally, even if we regarded the entry provisions as interfering with Jordan's

right to possession, Nationstar was nevertheless justified in securing Jordan's

abandoned property. The *Restatement* recognizes three exceptions to the general

rule that mortgagees cannot obtain possession of the mortgagor's property before

foreclosure: (1) mortgagor consent, (2) mortgagee's possession as the result of

peaceful entry in good faith after purchasing the property at a void or voidable

foreclosure sale, and (3) mortgagor abandonment. RESTATEMENT § 4.1 cmt. c. Here,

the evidence supported Nationstar securing Jordan's home under the mortgagor

abandonment exception. Months after Jordan defaulted on her loan, Nationstar

inspected Jordan's property and determined that it was vacant. Nationstar then

changed the locks, which it was allowed to do under the entry provisions in order to

secure the property. *Cf. PNC Bank, NA v. Van Hoornaar*, 44 F. Supp. 3d 846, 856-

57 (E.D. Wis. 2014) (dismissing trespass claim against lender for changing a

homeowner's locks upon default because the mortgage agreement authorizing the

*Jordan v. Nationstar Mortgage, LLC*, 92081-8 (Stephens, J. Dissenting)

lender to secure the premises upon default or abandonment created an implied consent to entry); *see also Tennant v. Chase Home Fin., LLC*, 187 So. 3d 1172, 1181-82 (Ala. Civ. App. 2015). Moreover, public policy considerations support Nationstar securing Jordan's abandoned property: "Not only is it important to protect the [property] against the elements and vandalism, but society is benefited by [the property's] productive use." RESTATEMENT § 4.1 cmt. c.

Pursuant to entry agreements like the one mutually agreed on by Nationstar and Jordan, a lender may "enter, maintain, and secure" seemingly abandoned property before foreclosure without taking "possession" of it. Because the first certified question should be answered in the affirmative, I dissent.

*Jordan v. Nationstar Mortgage, LLC*, 92081-8 (Stephens, J. Dissenting)

Steph _____ J.

Gods MCad, J.

Madsen, C. J.

# EXHIBIT B

# Why A Bank Was Allowed To Plunder Family Heirlooms That Escaped The Nazis

AVIVA SHEN
SEP 5, 2015, 1:00 PM



CREDIT DAVID ADIER/ANDREW BREINER

Few books have seen as many miles, as much pain and triumph, as Henri Adier's childhood diary. It recounted the Belgium-born Adier's experiences helping his family—then called the Adlersteins—to evade the Third Reich in Vichy France, at an age when most boys are focused on puberty and pop quizzes.

When Adier died at 82, he was downstairs in the Morristown, New Jersey home where he and his late wife Rita raised their two adopted children. As of his death in August of 2012, that house held the physical and emotional spoils of the Adlersteins' elusion. Henri's children hadn't lived there for years, but they began the painful preparations that follow the death of a parent.

There were practical matters to tend to, and finding the energy to crack open Henri's handwritten memories was always a task for the future.

"I don't think any of us ever looked at it," Henri's son David said in an interview. "There was a time he expressed a desire to write his memoirs. We'd get him set up and he'd pull out his diary and start looking through it," he said, tearing up. "There'd be a definite change in his demeanor."

"He'd close the book and put it in a drawer and say, 'today isn't the day. Another time.'"

The stories and recollections that book contained must have been gripping. Henri didn't just survive the war. After Paris fell and soldiers sealed his family's apartment, the boy helped his father—David's grandfather, a tailor by trade—to sneak into the flat and boost sacred family heirlooms: a kiddish cup, a seder plate, and some other objects.

The liberated silver came with the Adlersteins to America. They stayed in the family through the official name change that helped David's parents find work as educators in northern New Jersey, through Henri and his late wife Rita's decision to adopt David and his sister Anne in Florida.

But they didn't survive Wells Fargo. Neither did Henri's diary.

After Henri died and Hurricane Sandy devastated David's business, he says, financial paperwork involving the Adier family home was slow to process. Henri's mortgage, which had been current when he died, went unpaid for two months.

Then, a lawsuit by David and Anne Adier alleges, agents under contract to Wells Fargo visited the house in Morristown, New Jersey, and decided it was abandoned. The inspectors' finding allowed the bank's property management subcontractor, Lender Processing Services (LPS), to ask the bank to authorize what's called a "lockout." The inspectors left a sticker on the Adiers' door warning that the bank would consider it abandoned and start changing locks unless notified otherwise.

Anne Adier discovered the sticker on November 6, 2012, the Adiers say, and called the company to inform them they were mistaken, that the house was being looked after and didn't need to be secured on Wells Fargo's behalf. "They thanked her for calling and assured her nothing would happen to the property," David said. (Anne declined to be interviewed.)

   

Three weeks later, though, David arrived to find the locks changed and the house ransacked. David called the police, but "their party line was this is a civil matter between you and the bank." Despite Anne's conversation with LPS, Wells Fargo's contractors had gotten approval to go into the Adier home. They changed the locks. When David finally got back into the house weeks later, he found it ransacked.

The loss of family artifacts stings, but the alleged thefts also sealed the last window David and Anne had back into their father's past. Henri's diary is gone, and with it his children's chance to better know his traumas and triumphs. David, who said his father relayed few detailed stories of his war years, takes that loss harder than the ceremonial objects, the coin and stamp collections, the furnishings that surrounded him growing up in that house.

"There'd been some hope after his passing of having a chance to sit down with that diary and better understand some of those things he'd gone through that he found so hard to share with his family," he said. "That's one of the things that got scooped up by these thugs that came in under the bank's orders."

Wells Fargo hadn't initiated foreclosure proceedings, but refused to deal with David until he furnished his father's death certificate. After he sent that over, he says the bank demanded to see court papers deeming David his father's executor. When those documents were certified, the bank finally began negotiating with David about the property's future.

By then it was the spring of 2013. Bank agents had visited the house repeatedly. Almost every material object had been taken, including family photos and a diary Henri kept of his wartime travails.

"It became this game of cat and mouse, until everything of value—down to the brass door knocker—had been taken," Adier said.

- - -



HENRI ADIER, RIGHT, CELEBRATES LIBERATION IN FRANCE WITH RELATIVES CREDIT DAVID ADIER

### Your Home Is Your Castle Until The Bank Decides Otherwise

When foreclosed homes are legitimately abandoned, banks are required to secure the properties. Lockouts, trashouts, and weatherization help prevent vermin, criminals, and neglect from destroying the value of a home that's become bank- or investor-owned. Federal rules require mortgage servicers to perform such work in a timely fashion to maintain the security and property value of neighborhoods, and banks including Wells Fargo have been successfully sued for alleged civil rights violations when they've failed to perform such upkeep in black and brown neighborhoods, allowing blight to spread at everyone's expense.

That community interest puts people like the Adiers in a bind—and one that's hard to untie, according to City University of New York Law School professor Alan White. "On the one hand they have to make sure they act promptly to secure abandoned properties," he said. "But if that's not a careful, individualized determination by people who have some sort of past relationship with the homeowner, there's always a risk of error."

*The stage is set for a lot of mistakes.*

Inspections rules, and the public interest that motivates them, can be followed without locking out legitimate homeowners. With millions of distressed properties

around the country, all indications are that most of the time servicers get it right.

But property inspectors working on a sub-subcontracted basis for a far-distant megabank don't have much incentive not to screw it up– and they have made painful mistakes in hundreds of cases all around the country ever since the housing crash brought a deluge of foreclosures.

A Huffington Post investigation in 2013 found over 250 lawsuits across 31 states relating to bank contractors' inspections and lockouts work. Documents leaked to that site by a former compliance specialist with one of the largest property maintenance firms in the business indicate that firm alone was fielding as many as 100 complaints a month in the wake of the crisis.

Part of the problem is how easy it is to get an inspector job, according to Lisa Epstein, a Florida housing rights activist who got involved in local homeowner advocacy work after her own foreclosure nightmare in the wake of the financial crisis. "You basically have to have a working car, a driver's license, and a digital camera," Epstein told ThinkProgress. "You drive by the homes, take a picture, fill out a simple form. You upload the picture, you upload a little questionnaire, and you go on to the next one." If an inspector makes an error and marks your house down vacant, good luck getting the truth to your mortgage servicer in time to prevent one of those same contractors from coming back and locking you out of your home.

The Adlers' ability to win any kind of recourse—not that Henri's memories are replaceable—may hinge on the law's treatment of a string of contracts by which Wells Fargo outsources the on-the-ground work of preventing neighborhood blight to others.



THE ADLER FAMILY HOME CREDIT: DAVID ADLER

"The way it works in most cases is the bank engages a property preservation company, which then sub-contracts with another company, who then sub-subcontracts with day laborers to save as much money as possible," said plaintiffs' attorney Josh Denbeaux, referring to numerous confidential contracts he has seen in other cases but cannot discuss in detail. "The day laborers get paid $10, $12, $15 bucks a pop for doing a drive-by inspection. They get $200 to $300 for a lockout."

There is little in the way of accountability or professional training to counteract the skewing effect of those wage incentives, according to Center for American Progress housing market expert Julia Gordon. "The compensation to do the work quickly is there," Gordon told ThinkProgress, but not the kind of compensation that would motivate people to do it correctly.

"This is a very blue-collar industry," she said. "You lock up so many properties, you get a certain dollar amount for each one, so the incentive is to move through them pretty quickly." Between the workers' incentive to move fast and request more lucrative lockout work and the legal obligations facing servicers, things can escalate fast. "The stage is set for a lot of mistakes," said Gordon.

Wells Fargo doesn't dispute that its sub-contracted agents conducted a lockout and a trashout on Henri Adler's home, but believes that it had the proper legal authority to perform any actions necessary to secure a home they thought to be abandoned.

Bank spokesman Tom Goyda told ThinkProgress they had no knowledge of any specific family valuables being taken from the house. "When our contractors arrived the home was unlocked, the doors were open, there were no utilities on, and the property was in disarray," Goyda said. Goyda acknowledged that foreclosure proceedings did not formally begin until the following spring, but said the mortgage contract and New Jersey law both empower and require the servicer "to secure a vacant and abandoned property to protect the value of the property for the investors for which it's serviced."

Goyda would not discuss Anne Adier's call to LPS, which Denbeaux said is corroborated by phone records, nor Denbeaux's contention that Wells Fargo should have initiated foreclosure before locking out the house. An LPS representative did not respond by press time.

It's entirely plausible that Anne's call was faithfully recorded by whoever she spoke to without that information ever making it to the other companies involved, said National Consumer Law Center counsel Margot Saunders.

"This is a huge corporation dealing with another huge corporation, and nobody in the United States at this point should be unaware of the fact that huge corporations don't communicate that well, either within themselves or with other people," she said.

Many homeowners victimized by improper lockouts have won suits or settlements to cover the cost of damages to their property. But some mistakes can't be undone.



THE ADLER FAMILY IN THE HOUSE ON ANNE'S WEDDING DAY  CREDIT  DAVID ADLER

Even if memories were as replaceable as property, the loss of Henri's diary has cut his children off from his past irrevocably. "My father did not speak of his Holocaust years often," David said. Jewish holidays were an exception. Something about taking those old ceremonial objects down from a shelf and putting them to use again seemed to kick something loose for the survivor. "We'd use the heirlooms that had been taken from the apartment in France, and those were the times he talked about his life over there," said David. "He had a very strong sense of family and a very strong sense of his religion. It was at those times when you could see them both come together."

Until a friend of Anne's interviewed Henri for a school project, the children he adopted had heard few of his stories from the time. Henri recounted some of his closest calls. He was briefly sent to a children's internment camp by France's German occupiers, and escaped only because he came down with appendicitis and got sent to a convent to recover. Another time, he was a bit too slow to respond to a Nazi soldier who called him by his fake name, and thought he was about to be shot—only to have the soldier hand him some cash as thanks for the work he'd been conscripted into on an airstrip.

David and Anne's recollections of the few stories Henri shared now stand as the sole surviving record of the years that the French underground kept the Adlersteins out of fascist clutches. Even the physical touchstones that linked them back to those experiences are gone.

## Too Big To Be Humane

When the responsibility for a home lies with a local bank with deeper ties to the community and a direct financial interest in maintaining the value of the real estate, the incentives run the opposite direction. The bank's own financial performance will benefit if it can keep a struggling homeowner in their house on a revised mortgage, so there is less reason to rush into foreclosure. It has tighter relationships with the homeowner, her neighbors, and her attorneys, all of which help mitigate the risk of incorrect inspection findings and erroneous lockouts.

"If you look at smaller servicers who work in a particular geographic area with a small book [of loans] and they know their customers, they've had a very different experience," Gordon said, noting that new federal regulations on servicing have exempted smaller firms.

For giant servicers like Wells Fargo that have millions of loans on their books, the motivation is entirely different. Servicers get paid a monthly fee for handling the nitty-gritty work on each individual mortgage they service. But the fee they earn is based on the mortgage principal outstanding—a figure on a piece of paper that doesn't shrink if the real-life value of the home dips, giving servicers no vested interest in the actual, long-term quality of the property.

"The middlemen responsible for maintaining the collateral have all kinds of fees and incentives to keep a property on the book for 60 percent more than what it's really worth, as well as to milk investors for that monthly fee every month for as long as possible," Epstein said. "Because what do they care? Their interests are not aligned with the real financial interests of the actual property owner, who's losing money every month."

These misaligned incentives elongate the distance between Henri Adier's children and the bank that gets paid to "service" his mortgage gets elongated by a string of subcontracts.

## *The pain is just as fresh as when it happened.*

As these chains of responsibility sprawl, the prospect of egregious errors that destroy family memories and violate the sanctity of private homes grows. Communication breaks down between subcontractors, sub-subcontractors, homeowners, and the actual servicing company of record. "Everybody's passing the buck," said CAP's Gordon.

The problem may be that there aren't enough bucks to pass. Servicing is one of the least-lucrative parts of the home loans business. If there were more money in it, there might be less incentive to shuck the scutwork off onto subcontractors. "It's not a moneymaking business," White said.

Homeownership has been central to the American Dream for lifetimes now. If banks can bust into your house—or your dead father's house—and make off with the objects and memories that you bought that house to preserve, the dream itself starts to curdle.

"It's the house that my sister and I were raised in, that my parents built their American dream in," David Adier said, apologizing as his voice broke again. "That was all suddenly taken away by people who decided they had rights they didn't have."

Too often, the kind of good-faith effort Anne made to correct an inspector's error before it's too late isn't enough to spare someone a bank-authorized break-in. "It's not that mistakes are made. They're made in every industry," Gordon said. "It's when it turns from just a mistake anybody can make into something more Kafkaesque."

So long as the mortgage servicing business remains concentrated in relatively few corporate hands, and servicing continues to be treated as a low-value segment by the rest of the financial players in the mortgage industry, there's not much reason to think things will get better.

"There's a problem of too big to comply, or too big to be humane." White said. Wells Fargo and the other mega-servicers are responsible for more than half of all U.S. mortgages.

"The risk of error is all compounded by that market concentration," he said.



HENRI ADIER GRADING PAPERS AT THE KITCHEN TABLE CRED T DAVID ADIER

### Building A Better Mousetrap

The risk of bank agents inappropriately deeming a house abandoned and entering it is difficult to mitigate. The option that would likely be most effective is also the least practical: drive the business of servicing mortgages out of these gigantic national companies and back into local operations and community banks that will have incentives to perform this work more diligently.

But pushing the biggest banks in the country out of the servicing business would be almost impossible in political terms—as recent history has shown—let alone legally or logistically.

How, then, to reform the existing leviathan that has proven itself so capable of destroying people's homes and violating a central tenet of the American economic-mobility mythos?

It will take a combination of higher legal standards for servicers and retraining local law enforcement to assert homeowners' rights instead of siding with bank agents by default, the experts said. "Any other breaking and entering would be considered criminal, but law enforcement won't do anything," Epstein said.

Police willingness to privilege a bank agent's claims of legitimacy over a homeowner's, as the Adiers say some Morristown officers did, removes a key firewall from cases where a servicer has authorized an inappropriate lockout.

"I think there's an institutional bias in favor of institutions, not people," said Denbeaux, who believes that educating cops about the law would change things. "There would be a protocol. 'Show me the court order. Don't have one? Show me the deed. Don't have one? OK, you have 10 seconds to get off this property or I'm arresting you for trespassing.'"

Ideally, bank inspectors would act more diligently and cops would never be forced to adjudicate such disputes. Regulatory or legislative action is probably required to achieve a meaningful change in servicer and contractor behavior. Recent Consumer Financial Protection Bureau rules for servicers included limits on inspection fees, Saunders said in an interview, but set no federal standard for conducting the inspections themselves. "They can send 'em out all they want," she said, "they just can't charge the homeowner."

Any more aggressive restrictions on inspections could threaten the balance between neighborhood security and individual homeowners' rights, White warned. "The more you require we absolutely have to be positive the homeowner's not there, the more risk you create that when a property really is abandoned it's going

to sit there too long," White said. "There isn't necessarily an obvious and easy solution."

But if public officials are going to take it on themselves to force the inspections trade to shape up, they might as well go further. "I think there needs to be a lot more policy work done in this area," said Gordon, noting that the hyper-local effect of foreclosures and abandonment has lead local lawmakers to enact an endlessly complex fabric of different policies and requirements. Shifting to one national standard for the entire foreclosure process might help standardize conduct.

Meanwhile, it's people like Anne and David Adler who get crossed up by the housing finance industry.

"We are three years on and the pain is just as fresh as when it happened. There's been no closure, no healing," David said. "We really didn't have an opportunity to mourn."

Anne still can't bear to visit their childhood home, and every time David drops by he plunges back into the same turmoil. "I get within a few miles of it and a giant surge of anxiety fills me. It's not the way I should feel about the home I grew up in," he said.

"It wasn't just the things that were stolen. Our sense of security was taken from us."

# ThinkProgress has a problem, and we need your help to solve it.

Ad networks are targeting ThinkProgress simply because we cover white nationalism and other controversial topics. They've recently placed ThinkProgress into a category of sites that produce "controversial political content," which many advertisers are blocking. ThinkProgress relies on advertising revenue to fund a substantial portion of our work. In other words, we are being financially punished for our work exposing racism.

One thing is certain: We will not change our mission or our approach to the news to bring back advertisers.

## Will you join us?

### BECOME A MEMBER

#BANKS,  #ECONOMIC JUSTICE,  #ECONOMY,  #FORECLOSURES

**Sponsored Content**

**There Are 7 Types of Irish Last Names — Which One Is Yours?**
Ancestry

**Teen Kicked Out Of Prom When Adults Can't Stop Staring**
Design Bump

**7 Yoga Poses You Should Do First Thing In The Morning**
Work + Money

**Shoppers Are Getting Unbelievable Deals With This Little-Known Site**

Tophatter

## A Wild Wild Quiz: Test Your TV Westerns Knowledge

Zoo.com

## 35 Most Attractive Redheads Ever

Direct Expose

## Don't Do It Yourself - Hire a Wenatchee Handyman for Your Home Projects

HomeAdvisor

## It Won't Sell: 7 Things That Homebuyers Don't Want to See

Bankrate

Sponsored Links by Taboola

## More From ThinkProgress

**Hatch claims poor people don't deserve government help because 'they won't help themselves'**

thinkprogress.org

**Op-Ed: I am a Cherokee woman. Elizabeth Warren is not.**

thinkprogress.org

**LGBTQ rights just had a horrible day in the Supreme Court**

thinkprogress.org

**Pay very close attention to what Trump's lawyer is saying. He's making absolutely no sense.**

thinkprogress.org

**GOP sneaks provision into tax bill to benefit one college favored by Republican billionaires**

thinkprogress.org

**The Trump administration could cost the anti-LGBTQ cake baker a victory in the Supreme Court**

thinkprogress.org

**The Senate is about to confirm a judge who would supercharge religious attacks on science**

thinkprogress.org

**Trump's sexually suggestive tweet sparks feud with Sen. Gillibrand**

thinkprogress.org

|       |            |            |            |      |         | by Taboola |         |
|-------|------------|------------|------------|------|---------|------------|---------|
| About | Contact Us | Membership | Newsletter | Tips | Careers | Masthead   | Pitches |

© 2017 ThinkProgress

Powered by WordPress.com VIP

# EXHIBIT C

1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7  LAURA ZAMORA JORDAN, as her
   separate estate, and on behalf of others          NO: 2:14-CV-0175-TOR
8  similarly situated,

                                                     ORDER CERTIFYING QUESTIONS
9                          Plaintiff,                 TO WASHINGTON SUPREME
                                                     COURT
10         v.

11 NATIONSTAR MORTGAGE, LLC, a
   Delaware limited liability company,
12
                           Defendant.
13

14         On July 30, 2015, this Court heard oral argument on Nationstar's Motion for

15 Partial Summary Judgment (ECF No. 45) and Plaintiff's Motion for Partial

16 Summary Judgment (ECF No. 61).

17         Finding that the instant motions present questions of state law that have not

18 been clearly determined by either the Washington Supreme Court or the

19 Washington appellate courts and that answers to these questions are necessary to

20

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 1

1  dispose of these motions, this Court, upon its own motion, certifies to the

2  Washington Supreme Court several questions of law.

### DISCUSSION

4  RCW chapter 2.60 governs the procedure for a federal court to certify a

5  question of state law to the Washington Supreme Court:

> When in the opinion of any federal court before whom a proceeding is
> pending, it is necessary to ascertain the local law of [Washington] in
> order to dispose of such proceeding and the local law has not been
> clearly determined, such federal court may certify to the supreme
> court for answer the question of local law involved and the supreme
> court shall render its opinion in answer thereto.

RCW 2.60.020.[1]  Certification is particularly appropriate when the state law issue

is especially complex and presents significant policy implications.  *Perez-Farias v.*

*Glob. Horizons, Inc.*, 668 F.3d 589, 593 (9th Cir. 2011); *see also Keystone Land &*

*Dev. Co. v. Xerox Corp.*, 353 F.3d 1093, 1097 (9th Cir. 2003) (holding that

certification is appropriate where an unsettled issue of law, if clarified definitively,

---

[1] Pursuant to the Washington Rules of Appellate Procedure, "[t]he Supreme Court

may entertain a petition to determine a question of law certified to it under the

Federal Court Local Law Certificate Procedure Act if the question of state law is

one which has not been clearly determined and does not involve a question

determined by reference to the United States Constitution."  Wash. R. App. P.

16.16(a).

1  would have "far-reaching effects" on those subject to Washington law).  As noted

2  by the Supreme Court, the certification procedure, when appropriately invoked,

3  saves "time, energy, and resources and helps build a cooperative judicial

4  federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).  Such a procedure

5  "may be invoked by a federal court upon its own motion or upon the motion of any

6  interested party in the litigation involved."  RCW 2.60.030(1).

7       Here, the parties' cross-motions for partial summary judgment present

8  complex issues of state law, which have significant policy implications and will

9  have far-reaching effects on those in Washington.  Put succinctly, this Court has

10  been asked to decide whether so-called Entry Provisions within the deeds of trust

11  of Plaintiff and other class members are enforceable under Washington law absent

12  post-default consent of the borrower or permission from a court.  Nationstar

13  contends the Provisions—akin to a limited license or similar non-possessory

14  interest in land—merely grant the lender the ability to enter, maintain, and secure

15  the encumbered property and that such conduct does not constitute possession in

16  violation of Washington's lien theory of mortgages.  Ms. Jordan, on the other hand,

17  contends the Entry Provisions unlawfully deprive a borrower of her exclusive right

18  to possession prior to foreclosure and that the borrower cannot agree by contract to

19  relinquish such a right prior to default.  Instead, Ms. Jordan asserts that the lender

20

1   either must obtain post-default consent of the borrower or a court-appointed

2   receiver pursuant to RCW chapter 7.60.

3        Because of the complexity of the state law issues presented in the parties'

4   cross-motions for partial summary judgment and their significant policy

5   implications, this Court finds that the Washington Supreme Court, which has not

6   had occasion to settle these issues, "is better qualified to answer the certified

7   questions in the first instance." *See Perez-Farias*, 668 F.3d at 593 (alteration

8   omitted). Further, this Court finds the Washington Supreme Court's answers are

9   "necessary . . . in order to dispose of [this] proceeding." RCW 2.60.020.

10              **STATEMENT OF UNDISPUTED MATERIAL FACTS**

11        The undisputed material facts are as follows:

12        In 2007, Ms. Jordan bought a home in Wenatchee, Washington, and, like

13   other class members, secured her home loan by signing a deed of trust. ECF No.

14   3-5 at 54-69. Homecomings Financial was the original lender named in the deed

15   of trust, *id.* at 54; however, it subsequently assigned the loan to Fannie Mae, ECF

16   Nos. 46 ¶ 11; 59 ¶ 2. The deed of trust contains the following provision, which

17

18

19

20

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 4

permits the lender[2] to enter, maintain, and secure the property after the borrower's

default or abandonment:

> 9.      **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

---

[2] Pursuant to the terms of the deed of trust, "[t]he covenants and agreements of [t]he Security Instrument shall bind . . . and benefit the successors and assigns of Lender." ECF No. 3-5 at 63.

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 5

1 | ECF No. 3-5 at 61. The deed of trust contains another provision discussing the

2 | borrower's obligation to preserve, maintain, and protect the property. *Id.* at 60.

3 | This provision allows the lender "or its agent [to] make reasonable entries upon

4 | and inspections of the property" but only if the lender has reasonable cause and

5 | first gives the borrower notice. *Id.* These two provisions comprise the so-called

6 | "Entry Provisions."

7 | Ms. Jordan made her last loan payment in December 2010 and subsequently

8 | went into default. ECF No. 3-3 ¶ 7. In March 2011, Nationstar—whom Fannie

9 | Mae had hired to service the loan in 2008, *id.* ¶ 3—hired a vendor to perform an

10 | exterior inspection of Ms. Jordan's property and the vendor preliminarily

11 | determined that it was vacant.[3] ECF Nos. 3-5 at 46, 48; 3-8 ¶ 10 (citing ECF No.

12 | 3-8 at 6-8). Nationstar then ordered entry of Ms. Jordan's property. ECF No. 3-8

13 | ¶¶ 11-12. The vendor changed the lock on the front door and posted the following

14 | notice:

15 | NOTICE[:] THIS PROPERTY WAS FOUND TO BE UNSECURE
OR VACANT. In protection of the interest of the owner as well as
16 | the mortgagee, and in accordance with the terms of this mortgage, the
property has been secured against entry by unauthorized persons to
17 | prevent possible damage. The key will be available to the owner of
the property or their representative only.

18 |

19 | [3] The parties dispute whether Ms. Jordan had actually abandoned or otherwise

20 | vacated her home when Nationstar ordered entry. ECF Nos. 62 ¶ 12; 67 at 3.

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 6

1

2
ECF No. 63-1 at 6, 9. The Notice also provided Ms. Jordan a name and telephone

3
number to contact "for further information." *Id.*

4
     Ms. Jordan subsequently called the number, obtained the key, and re-entered

5
her home. ECF No. 3-5 at 11-14. Ms. Jordan removed her possessions from the

6
home the next day, returned the key to the lock box, and vacated the property. *Id.*

7
at 15, 20. Nationstar's vendors have since winterized the property and maintained

8
its lawn. ECF No. 3-8 ¶ 18.

9
     On April 3, 2012, Ms. Jordan filed her Complaint in Chelan County

10
Superior Court against Nationstar Mortgage, LLC, alleging numerous state law

11
causes of action, including trespass, breach of contract, violation of the

12
Washington Consumer Protection Act, as well as violation of the Fair Debt

13
Collection Practices Act ("FDCPA").[4] ECF No. 2-4. Nationstar subsequently

14
removed the case to this Court.[5] ECF No. 1.

15

16
    

[4] Ms. Jordan subsequently filed a First and Second Amended Complaint alleging

17
these same claims and seeking class action relief. ECF Nos. 2-13; 2-19.

18
[5] On September 9, 2014, this Court remanded proceedings to the Chelan County

19
Superior Court, finding that Nationstar's removal was untimely. ECF No. 18. On

20
April 1, 2015, the Ninth Circuit reversed and remanded this decision in light of a

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 7

1    The parties then filed cross motions for partial summary judgment on two

2    similar, but distinguishable, legal issues.[6]  Nationstar's motion asked the Court to

3    hold as a matter of law that the so-called Entry Provisions within the deed of trust

4    are enforceable under Washington law.  ECF No. 45 at 8-9.  Ms. Jordan's motion,

5    on the other hand, asked the Court to hold as a matter of law that, before the lender

6    can lawfully act upon the Entry Provisions, the lender is first required to obtain the

7    borrower's post-default consent or permission from a court.  ECF No. 61 at 3.[7]

8                              **QUESTIONS OF LAW**

9        "[The Washington Supreme Court does] not consider the legal issues in the

10   abstract but instead consider[s] them based on the certified record that the federal

11   court provides."  *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wash. 2d 789, 799

---

12   recent Supreme Court ruling instructing courts to interpret the provisions of the

13   Class Action Fairness Act broadly in favor of removal.  ECF No. 39.

14   [6] Whether Nationstar's vendors actual activities exceeded the scope of the lender's

15   permission, relevant for Plaintiff's trespass claims, is a question of fact not yet

16   before the Court.

17   [7] Nationstar also moved for summary judgment on Ms. Jordan's individual Fair

18   Debt Collection Practices Act ("FDCPA") claim.  ECF No. 45 at 23-24.  Ms.

19   Jordan conceded that summary judgment should be entered on this claim.  ECF

20   No. 57 at 19.  This Court dismissed this claim in a separate order.

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 8

Case 2:14-cv-00175-TOR   Document 72   Filed 08/10/15

1   (2010). "Once the court has decided to rule on a certified question pursuant to

2   RCW 2.60.020, the ruling is not advisory but resolves actual issues pending in the

3   federal proceeding and will be legal precedent in all future controversies involving

4   the same legal question." *Gray v. Suttell & Assocs.*, 181 Wash. 2d 329, 337

5   (2014).

6       The Court certifies the following questions of law:

7       (1) Under Washington's lien theory of mortgages and RCW 7.28.230(1),
    can a borrower and lender enter into a contractual agreement prior to
8   default that allows the lender to enter, maintain, and secure the
    encumbered property prior to foreclosure?

9

10      (2) Does RCW chapter 7.60, Washington's statutory receivership scheme,
    provide the exclusive remedy, absent post-default consent by the
    borrower, for a lender to gain access to an encumbered property prior to
11  foreclosure?

12      This Court's framing of the questions is not intended to restrict the

13  Washington Supreme Court's consideration of any issues it determines are

14  relevant. *See Keystone*, 353 F.3d at 1098. This Court further acknowledges that

15  the Washington Supreme Court may, in its discretion, reformulate the questions if

16  it decides to answer these certified questions. *Perez-Farias*, 668 F.3d at 589.

17  **ACCORDINGLY, IT IS ORDERED:**

18      1. This Court **CERTIFIES** the above questions of law.

19      2. Further proceedings in this Court are **STAYED** pending the Washington

20

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 9

1  Supreme Court's decision whether it will accept review, and if so, the proceedings

2  will remain stayed pending receipt of the answers to the certified questions.

3         3.  If the Washington Supreme Court accepts review of the certified

4  questions, this Court designates Ms. Jordan and others similarly situated to file the

5  first brief. *See* Wash. R. App. P. 16.16(e)(1).

6         4.  If the Washington Supreme Court accepts review of the certified

7  questions, the parties shall file a joint status report every six months from the date

8  of the acceptance, or more frequently if the circumstances so warrant.

9         5.  The District Court Executive is directed to submit to the Washington

10  Supreme Court certified copies of this Order, the docket in the above-captioned

11  matter, and Docket Numbers 3-3, 3-5, 3-8, 45, 46, 47, 58, 59, 60, 61, 62, 63, 66,

12  67, 68, and 69.  The record so compiled contains all matters in the pending cause .

13  of action material for consideration of the certified questions. *See* RCW

14  2.60.010(4).

15         6.  The District Court Executive is further directed to enter this Order and

16  provide copies to counsel.

17         **DATED** August 10, 2015

18  

19                                   THOMAS O. RICE
                                   United States District Judge

20

ORDER CERTIFYING QUESTIONS TO WASHINGTON SUPREME COURT ~ 10

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    EASTERN DISTRICT OF WASHINGTON

7   LAURA ZAMORA JORDAN, as her
    separate estate, and on behalf of others          NO. 2:14-CV-0175-TOR
8   similarly situated,
                                                      ORDER GRANTING IN PART
9                          Plaintiff,                 PLAINTIFF'S MOTION FOR
                                                      PARTIAL SUMMARY JUDGMENT
10        v.

11  NATIONSTAR MORTGAGE, LLC, a
    Delaware limited liability company,
12
                           Defendant,
13
          and
14
    FEDERAL HOUSING FINANCE
15  AGENCY,

16                         Intervenor.

17

18        BEFORE THE COURT is Plaintiff's Motion for Partial Summary Judgment.

19  ECF No. 217. This matter was submitted for consideration with oral argument on

20  November 15, 2017. The Court has reviewed the motion, the record and files

    ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
    SUMMARY JUDGMENT ~ 1

1  herein, and is fully informed.  For the reasons discussed below, Plaintiff's Motion

2  for Partial Summary Judgment (ECF No. 217) is **GRANTED in part**.

3                              **BACKGROUND**

4        This case arises from actions taken by Defendant Nationstar Mortgage LLC

5  ("Nationstar") affecting Washington homeowners' residential properties in default.

6  ECF No. 2-4.  Plaintiff and Class Representative Laura Zamora Jordan ("Ms.

7  Jordan") seeks summary judgment for a common law trespass claim,[1] Washington

8  Consumer Protection Act (CPA) claim, and damages for injury to property caused

9  by the lock changes.  ECF No. 217.

10                              **FACTS[2]**

11  **A. Facts Relating to Ms. Jordan**

12        On April 4, 2011, Nationstar drilled out and replaced the lock on Ms.

13  Jordan's front door after she defaulted on her mortgage payments.  ECF Nos. 218

14  at ¶ 1; 227 at ¶ 1; 166-1 at 3 (Ex. 1).  Nationstar admits it did not issue a notice of

15  default.  ECF Nos. 218 at ¶ 2; 227 at 2.  Ms. Jordan called Nationstar and asked

16

17  [1]   Plaintiff asserted a statutory trespass claim in her Motion for Partial

18  Summary Judgment, but corrected at oral argument that she was only seeking

19  summary judgment on a common law trespass claim.  *See* ECF No. 217 at 8.

20  [2]   The following facts are not disputed unless otherwise noted.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 2

1  how to gain access to the property so that she could move out her personal items.

2  ECF No. 3-5 at 73 (Ex. 38). Nationstar then provided Ms. Jordan with the code to

3  the lockbox so that she could enter her home to obtain her items. *Id.* at 73–74. She

4  asked if she should put the key back in the lockbox after removing her items, to

5  which Nationstar responded yes. *Id.* at 74. Ms. Jordan spent the night in her house

6  and moved out her items the next day. ECF No. 166-1 at 9 (Ex. 1). She testified

7  that she believed Nationstar wanted her out of the property because of the lockbox

8  and it made her feel like she needed to move out. *Id.* at 8–9.

9        On December 29, 2011, Ms. Jordan's attorney sent a letter to Nationstar

10  demanding the immediate return of her property, restoration of the original locks,

11  and compensation for damages suffered. ECF No. 116-2 at 2 (Ex. 2). The Vice

12  President for Property Preservation at Nationstar, Jaime Burgess, declared that

13  Nationstar would instruct the vendor to remove the lockbox and provide the sole

14  key to the borrower if the borrower informs the vendor or Nationstar that the

15  property is occupied by the borrower. Alternatively, Mr. Burgess stated Nationstar

16  would rekey the same door and provide the sole key to the borrower if the

17  borrower prefers. ECF No. 225 at ¶¶ 1, 13. Yet, Ms. Jordan argues that this

18  statement is false and Nationstar refused to remove the lockbox or provide the key

19  to her after the December 29, 2011 letter. ECF No. 240 at ¶ 6.

20  //

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 3

### B. Nationstar's Alleged Uniform Practice

Nationstar claimed it was entitled to enter Ms. Jordan and Class members' homes because of "entry provisions" in their deeds of trust allowing the lender to enter, change the locks, and maintain the property after default but before foreclosure. ECF Nos. 218 at ¶ 9; 227 at ¶ 9; 3-5 at 61 (Ex. 19). Plaintiff alleges that Nationstar employed a uniform policy of rekeying properties, Nationstar claims that a number of the Class members' properties were not rekeyed. Nationstar concedes that it ceased rekeying properties in July 2016. ECF Nos. 218 at ¶ 13; 227 at ¶ 13. Nationstar also performed "property preservation" measures, which included property inspections, rekeying and winterizing property, and boarding up doors and windows. ECF Nos. 218 at ¶ 14; 227 at ¶ 14.

Nationstar admits it has no policy requiring it to contact the borrower immediately before rekeying the property, but asserts that all borrowers gave Nationstar permission to enter their property prior to foreclosure. ECF No. 227 at ¶ 16. Nationstar maintains records of property preservation activities and produced a list of 5,131 properties that were reported vacant prior to foreclosure sale. ECF Nos. 217 at ¶¶ 18–19; 227 at ¶¶ 18–19. Nationstar charged lock-change fees totaling $535,376 to 3,433 loans on the Class list and property preservation fees totaling $8,904,077.16 to 4,680 of the loans on the Class list. ECF Nos. 217 at ¶¶ 21–22; 277 at ¶¶ 21–22. The parties dispute whether Class members' money or

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 4

1  property was used to pay the assessed property preservation fees. ECF Nos. 217 at

2  ¶ 23; 227 at ¶ 23.

3  **C. Procedural History**

4       On April 3, 2012, Ms. Jordan filed her Complaint against Nationstar in

5  Chelan County Superior Court. ECF No. 2-4. Ms. Jordan subsequently filed a

6  First and Second Amended Complaint seeking class action relief. ECF Nos. 2-13;

7  2-19. In her Second Amended Complaint, Ms. Jordan asserted the following

8  causes of action: trespass; intentional trespass, RCW 4.24.630; violation of the

9  Consumer Protection Act, RCW 19.86 *et seq.*; and breach of contract. ECF No. 2-

10  19 at 10–16. Ms. Jordan also asserted a violation of the Fair Debt Collection

11  Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, but the Court dismissed Ms.

12  Jordan's individual FDCPA claim on August 10, 2015. ECF Nos. 2-19 at 11; 71 at

13  2. On May 9, 2014, the Chelan County Superior Court certified the Class,

14  pursuant to Washington Court Rules 23(a), 23(b)(1), and 23(b)(3). ECF No. 1-3

15  (Ex. C). Thereafter, Defendant removed the action to this Court. ECF No. 1.

16       Nationstar then filed a partial summary judgment motion asking the Court to

17  find that entry provisions are enforceable under Washington law. ECF No. 45 at

18  8–9. Ms. Jordan moved for partial summary judgment requesting the Court to find

19  that before a lender can lawfully act upon the entry provisions, the lender is first

20  required to obtain the borrower's post-default consent or permission from a court.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 5

1  ECF No. 61 at 8. The Court certified both questions to the Washington Supreme

2  Court and stayed the case. ECF No. 72 at 3, 9–10.

3      On July 7, 2016, the Washington Supreme Court entered its decision

4  finding the entry provisions in direct conflict with Washington law and, therefore,

5  unenforceable. ECF No. 89 at 5. Further, the Washington Supreme Court

6  determined that receivership, as defined by chapter 7.60 RCW, is not the exclusive

7  remedy for a lender to gain access to a borrower's property. *Id.* As a result, on

8  July 21, 2016, this Court denied the parties' cross-motions for partial summary

9  judgment (ECF Nos. 45 and 61), and lifted the stay. ECF No. 80. Nationstar then

10  moved to reconsider the denial of its partial summary judgment motion (ECF No.

11  82), which the Washington Supreme Court denied and filed its Certificate of

12  Finality on September 2, 2016. ECF No. 89.

13      On September 6, 2017, this Court denied Defendant's Motion to Decertify

14  Class and certified a slightly redefined Class. ECF No. 207. Ms. Jordan then filed

15  a Motion for Partial Summary Judgment. ECF No. 217.

16                            **DISCUSSION**

17      Summary judgment as to a "claim or defense–or the part of each claim or

18  defense" is appropriate when "there is no genuine dispute as to any material fact

19  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

20  For purposes of summary judgment, a fact is "material" if it might affect the

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 6

1  outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477

2  U.S. 242, 248 (1986). A material fact is "genuine" where the evidence is such that

3  a reasonable jury could find in favor of the non-moving party. *Id.* The moving

4  party bears the initial burden of showing the absence of any genuine issues of

5  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then

6  shifts to the non-moving party to identify specific facts showing there is a genuine

7  issue of material fact. *Anderson*, 477 U.S. at 256.

8       In ruling on a motion for summary judgment, the court views the facts, as

9  well as all rational inferences therefrom, in the light most favorable to the non-

10  moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court must only

11  consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764

12  (9th Cir. 2002). There must be evidence on which a jury could reasonably find for

13  the plaintiff and a "mere existence of a scintilla of evidence in support of the

14  plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

15       Nationstar contends that to prevail on summary judgment, Ms. Jordan must

16  prove each element of every Class member's claim. ECF No. 222 at 10 (citing

17  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1051 (2016) (Roberts, C.J.,

18  concurring)). In Justice Robert's concurring opinion, he stated that respondents

19  had to establish the amount of compensable time for each individual plaintiff to

20  prove liability and damages. Yet, Justice Roberts agreed with the Court that

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 7

1  despite the differences in time for each class member, respondents could prove the

2  amount of time through generalized, class-wide proof using a study and

3  representative evidence. *Tyson Foods*, 136 S.Ct. at 1051. Nationstar misinterprets

4  the necessity of proving each element of each class member's claim when the

5  Supreme Court concluded that generalized, class-wide proof was sufficient to

6  establish damages.

7  **A.    Applicable Class Members Affected by this Motion**

8      The Court first addresses the parties' dispute as to which Class members are

9  included in this Motion. While Nationstar contends that Ms. Jordan must prove

10 every element for each Class member, the Court finds that partial summary

11 judgment is appropriate for some Class members so as to narrow the issues for

12 trial. The Court determines that the instant Motion only applies to those Class

13 members who had their locks rekeyed prior to foreclosure.

14     Nationstar argues that at least one-third of the Class members did not have

15 their locks rekeyed. ECF No. 222 at 11. According to Ms. Jordan, 3,433 loans

16 were charged with lock-change fees totaling $535,376. ECF No. 218 at ¶ 21.

17 Nationstar emphasizes that there were 5,132 properties identified as vacant and so

18 Ms. Jordan fails to present evidence that locks were changed on the other 1,699

19 properties. ECF No. 222 at 11. In reply, Ms. Jordan asserts that Nationstar's

20 summary data shows it changed the locks on the homes of 3,066 Class members

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 8

1  while they owned their homes. ECF Nos. 237 at 9; 239 at ¶¶ 5–6.

2      Ms. Jordan concedes that there is a triable issue of fact for the rest of the

3  Class on whether their locks were changed and she plans to present evidence at

4  trial from Nationstar's records proving it performed lock changes on additional

5  homes. ECF No. 237 at 9. Ms. Jordan further admits that any Class member who

6  sold or disposed of his or her property prior to the lock change was not injured and

7  suffered no damage. *Id.* at 10. Nationstar asserted that there were 115 such

8  properties and Ms. Jordan's expert segregates these properties from its calculation

9  of damages. *Id.*; 224 at ¶ 2. At oral argument, Ms. Jordan further clarified that the

10 Class is only seeking partial summary judgment for those members who had their

11 locks changed prior to foreclosure.

12     Nationstar asserts that there is a triable issue as to whether Ms. Jordan and

13 other borrowers consented to the rekeying of their properties. ECF No. 222 at 12.

14 Nationstar cites that, in February 2011, Ms. Jordan told Nationstar that she did not

15 intend to make future payments, had no interest in keeping the property, and

16 wanted to foreclose. *Id.* Yet, Ms. Jordan merely stated that "she had used up all

17 her savings. And has no intent to pay ..." ECF Nos. 3-3 at 15 (Ex. 50); *see* 166-1

18 at 3 (Ex. 1). There is no evidence that she consented to the lock change, which

19 made her believe she had to move out of her home. ECF No. 166-1 at 9 (Ex. 1).

20 Additionally, Nationstar contends that other borrowers arguably consented to

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 9

1  Nationstar's rekeying of their doors, such as Steven Siegfried, Stacy Powers, and

2  David Lalonde. ECF No. 222 at 13.

3      At oral argument, Ms. Jordan asserted that the issue of consent is not

4  relevant to the instant motion, but should be asserted as an affirmative defense at

5  trial. However, borrowers who consented to the rekeying of their homes are

6  already excluded from the Class definition, which states "entering a Class

7  member's property without notice to the Class member; and/or without the express

8  contemporaneous consent of the Class member; and/or without permission of the

9  court..." ECF No. 207 at 26. Therefore, the Court's ruling on this Motion only

10  applies to those Class members who did not consent to the rekeying of their homes,

11  thereby fitting within the Class definition, and at trial Nationstar may assert

12  evidence of any individual class member's consent as a defense.

13      Additionally, Nationstar argues that Ms. Jordan fails to prove that some

14  Class members have standing because approximately 547 Class members filed

15  Chapter 7 bankruptcy petitions. ECF Nos. 222 at 12; 226 at ¶ 4. Ms. Jordan

16  concedes that it may be appropriate to narrow the Class to exclude members who

17  filed for bankruptcy after a lockout and enter judgment against members who

18  surrendered their properties in bankruptcy proceedings. ECF No. 237 at 11.

19      The Court is not convinced that it should so easily dismiss this subclass.

20  The bankruptcy code endows the bankruptcy trustee with the exclusive right to sue

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 10

1    on behalf of the estate. *Estate of Spirtos v. One San Bernardino Cty. Superior*

2    *Court Case Numbered SPR 02211*, 443 F.3d 1172, 1176 (9th Cir. 2006). "[A]

3    trustee, as the representative of the bankruptcy estate, is the proper party in

4    interest, and is the only party with standing to prosecute causes of action belonging

5    to the estate." *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004).

6    "Section 541 of the Bankruptcy Code provides that virtually all of a debtor's

7    assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of

8    a bankruptcy petition." *Id.* citing 11 U.S.C. § 541(a)(1) (providing that the

9    bankruptcy estate includes "all legal or equitable interest of the debtor in property

10   as of the commencement of the case"). "Such property includes causes of action

11   belonging to the debtor at the commencement of the bankruptcy case." *Id.* "On

12   request of a party in interest and after notice and a hearing, the court may order the

13   trustee to abandon any property of the estate that is burdensome to the estate or that

14   is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b). "At the

15   close of the bankruptcy case, property of the estate that is not abandoned under

16   § 554 and that is not administered in the bankruptcy proceedings remains the

17   property of the estate." *Parker*, 365 F.3d at 1272 (citing 11 U.S.C. § 554(d)).

18        Where an action is originally brought by a party other than the real party in

19   interest, Rule 17 provides that a court "may not dismiss an action for failure to

20   prosecute in the name of the real party in interest until, after an objection, a

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 11

1   reasonable time has been allowed for the real party in interest to ratify, join, or be

2   substituted into the action." Fed. R. Civ. P. 17(a)(3). If the real party in interest

3   ratifies, joins, or is substituted, the "action proceeds as if it had been originally

4   commenced by the real party in interest." *Id.*; *Copelan v. Techtronics Industries*

5   *Co., Ltd.*, 95 F.Supp.3d 1230, 1234 (S.D.Cal. 2015).

6       Since the trustees of the 547 Chapter 7 bankruptcy cases have not been

7   provided notice and an opportunity to ratify, join or be substituted, it is premature

8   to dismiss these claims.

9   **B.    Trespass Claim**

10      To establish common law intentional trespass, a plaintiff must show "(1) an

11  invasion of property affecting an interest in exclusive possession, (2) an intentional

12  act, (3) reasonable foreseeability that the act would disturb the plaintiff's

13  possessory interest, and (4) actual and substantial damages." *Ofuasia v. Smurr*,

14  198 Wash. App. 133, 149 (2017) (quoting *Grundy v. Brack Family Tr.*, 151 Wash.

15  App. 557, 567 (2009)); *Bradley v. Am. Smelting & Ref. Co.*, 104 Wash. 2d 677,

16  692–93 (1985) ("(1) invaded the plaintiff's interest in the exclusive possession of

17  his property, (2) been committed intentionally, (3) been done with the knowledge

18  and reasonable foreseeability that the act would disturb the plaintiffs' possession,

19  and (4) caused actual and substantial damages").

20  //

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 12

1    **1. Invasion of property affecting an interest in exclusive possession**

2        The Washington Supreme Court found "that Nationstar's conduct

3    constituted possession" because its actions were representative of control.

4    Rekeying the door had the "effect of communicating to Jordan that Nationstar now

5    controlled the property." ECF No. 89 at 15–16. The Washington Supreme Court

6    emphasized that even though Ms. Jordan had access to the lockbox, she "could no

7    longer access her home without going through Nationstar." *Id.* at 16. Therefore,

8    the Washington Supreme Court determined that Nationstar "effectively ousted"

9    Ms. Jordan when it changed the locks and exercised control of the property. *Id.*

10        The Court finds there is no genuine issue of material fact as to whether Ms.

11    Jordan suffered an invasion of her right to exclusive possession. The Court also

12    determines that those Class members who had their homes rekeyed meet the first

13    element of the intentional trespass claim. Accordingly, the Court concludes that

14    the first element of common law trespass is met for all such Class members as they

15    were either effectively ousted from their homes or, at a minimum, were no longer

16    in exclusive possession.

17    **2. Intentional act**

18        At oral argument, Nationstar conceded that it did not submit evidence to

19    contravene this issue. It is clear Nationstar intended to change the locks on the

20    doors of borrowers' homes, but Nationstar claims it did not intend to exclude Class

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 13

1  members from their homes because it made a key available.  The Washington

2  Supreme Court found this lockbox argument insufficient, determining that the

3  lockbox was an expression of control and Ms. Jordan could not access her home

4  without going through Nationstar as a "middle man."  ECF Nos. 89 at 16; 217 at

5  15.  The Court agrees that Nationstar acted intentionally in excluding Class

6  members from exclusive possession of their homes by installing lockboxes.

### 3. Reasonable foreseeability that the act would disturb possessory interest

9  Nationstar also admitted that it did not submit evidence to contravene this

10  element at oral argument.  The Court finds that it was reasonably foreseeable that

11  Nationstar's action of changing the locks would interfere with Class members'

12  possessory interest.  The Washington Supreme Court determined that Nationstar's

13  action left Ms. Jordan without a way of entering her property and she was only

14  able to access her home through Nationstar.  ECF No. 89 at 16.  Accordingly, the

15  Court finds that the third element of the intentional trespass claim is met because

16  changing locks on debtors' homes is a reasonably foreseeable interference of their

17  possessory interest.

### 4. Actual and substantial damages

19  Ms. Jordan alleges that Class members are entitled to the amount Nationstar

20  charged for the installation of the lock and the fair market rental value of their

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 14

1  homes during Nationstar's possession.  ECF No. 217 at 16.  Nationstar disputes

2  that Ms. Jordan can prove actual and substantial damages.  ECF No. 222 at 14.

3      "Damages for a temporary invasion or trespass are the cost of restoration

4  and the loss of use."  *Olympic Pipe Line Co. v. Thoeny*, 124 Wash. App. 381, 393–

5  94 (2004).  As already determined by the Washington Supreme Court, the lock

6  change effectively ousted the borrowers and thus, Nationstar's argument that the

7  lockbox caused no substantial harm and that the owner did not need to replace the

8  lock to enjoy possession of his or her home is rejected.  ECF Nos. 89 at 16; 222 at

9  15.  Therefore, the cost of restoring the home to its original state prior to rekeying

10  the properties is properly estimated by Nationstar's lock-change fees totaling

11  $535,376 to 3,433 loans on the Class list.  ECF Nos. 217 at 16, 166 at ¶ 14.

12      Additionally, Ms. Jordan and Class members are entitled to the fair market

13  rental value of their homes.  The Washington Supreme Court has held that when a

14  mortgagee takes possession of a mortgaged property without the consent of the

15  owner, the owner is entitled to reasonable rent.  *Howard v. Edgren*, 62 Wash.2d

16  884, 886 (1963); *see* ECF No. 217 at 27.  The Class submitted its expert report

17  calculating the reasonable rental value of each Class member's home from the time

18  Nationstar changed the locks until the date the loan was brought current or the

19  house sold.  ECF Nos. 217 at 28–29; 196 at ¶ 2.  Ms. Jordan admits that the

20  accuracy of these calculations is a factual question for trial and thus only requests

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 15

Case 2:14-cv-00175-TOR    ECF No. 262    filed 11/21/17    PageID.6663    Page 16 of 27

1    entry of judgment declaring that each Class member is entitled to recover the

2    reasonable rental value. ECF No. 217 at 29.  At oral argument, Nationstar asserted

3    that many class members continued to occupy their properties and thus [full] fair

4    rental value would not be appropriate.

5        The Court finds that Class members are entitled to the cost of restoration

6    regarding the rekeying of the debtors' locks, equivalent to Nationstar's lock change

7    fees in the amount of $535,376.  Class members are also entitled to the reasonable

8    rental value from the date Nationstar locked a house to the cure of any default or

9    when the property was properly liquidated, the exact calculation to be determined

10   at trial.  Nationstar may supply evidence at trial as to those Class members who

11   continued to occupy their homes after rekeying and their damages may be reduced

12   accordingly, but this issue is reserved for trial.

13       **5.  Statute of limitations issue**

14       Nationstar contends that some Class members' claims are barred by the

15   statute of limitations. ECF No. 222 at 17.  Nationstar argues that while the Class is

16   comprised of borrowers whose properties were deemed abandoned by Nationstar

17   within four years of the filed complaint, the statute of limitations for trespass upon

18   real property is only three years.  *Id.* at 17–18; RCW 4.16.080(1).  Yet, Ms. Jordan

19   emphasizes that the earliest lock change the Class relied on occurred on September

20   2, 2011. ECF Nos. 237 at 16; 238 at ¶ 10.  Nationstar fails to provide specific

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 16

1  Class members or a general number of those borrowers who do not fall within the

2  trespass statute of limitations.  The Court determines that should Nationstar

3  provide this information at trial, then those Class members may properly be

4  excluded.  The possibility of such borrowers' existence at the summary judgment

5  stage does not create a genuine issue of material fact to preclude partial summary

6  judgment.

7      Accordingly, the Court concludes that all Class members whose homes were

8  rekeyed are entitled to summary judgment on their intentional trespass claim, as

9  there is no genuine issue of material fact.

10  **C.    CPA Claim**

11      Under RCW 19.86.020, the CPA requires a plaintiff to establish:  "(1) unfair

12  or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest

13  impact; (4) injury to plaintiff in his or her business or property; and (5) causation."

14  *Hangman Ridge Training Stables, Inc. v. Safeco Titles Ins. Co.*, 105 Wash.2d 778,

15  780 (1986).

16  **1.  Unfair or deceptive act or practice**

17      The question of whether an act or practice is unfair or deceptive is a question

18  of law.  *Panag v. Farmers Ins. Co. of Washington*, 166 Wash.2d 27, 47 (2009)

19  (citing *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wash.2d 133, 150 (1997)).

20  The Washington Supreme Court has held that "a claim under the Washington CPA

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 17

1    may be predicated upon a per se violation of statute, an act or practice that has the

2    capacity to deceive substantial portions of the public, or an unfair or deceptive act

3    or practice not regulated by statute but in violation of public interest." *Klem v.*

4    *Washington Mut. Bank*, 176 Wash.2d 771, 787 (2013).  An act or practice can be

5    unfair without being deceptive because the "or" is disjunctive.  *Id.*  The Court

6    addresses both prongs in order to illustrate that Nationstar's practice is both unfair

7    and deceptive.

8        First, Nationstar's practice of rekeying the locks prior to foreclosure is

9    unfair.  The Washington Supreme Court held that changing the locks on a person's

10   home prior to foreclosure violates RCW 7.28.230.  ECF No. 89 at 17.  While

11   Plaintiff conceded at oral argument that changing the locks was not a per se CPA

12   violation, she argued that the act is still illegal and thus unfair.  The Washington

13   Supreme Court noted, "What is illegal and against public policy is per se an unfair

14   trade practice."  *Hangman Ridge*, 105 Wash.2d at 786.  The illegal act of rekeying

15   a borrower's home is then an unfair practice under this standard.

16       Nationstar emphasizes the standard outlined in *Klem* that a practice is unfair

17   if it "causes or is likely to cause substantial injury to consumers which is not

18   reasonably avoidable by consumers themselves and is not outweighed by

19   countervailing benefits."  *Klem*, 176 Wash.2d at 787 (citation and quotation

20

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 18

1  omitted).[3] Nationstar contends that the practice is not unfair because the rekeying

2  did not cause substantial injury.  This Court disagrees because, as the Washington

3  Supreme Court found, Nationstar exercised its control over Class members' homes

4  and in Ms. Jordan's case, effectively ousted her from her home.  ECF 89 at 16.

5        Additionally, Nationstar asserts that Class members could have avoided

6  injury by not defaulting on their loans and abandoning their properties.  ECF No.

7  222 at 20.  Yet, there is no evidence that Ms. Jordan abandoned her property when

8  she left for work in the morning and returned in the evening to find her home

9  locked.  ECF No. 166-1 at 5–6 (Ex. 1).  It is not illegal to default on a loan or even

10  abandon property.  Nationstar had other lawful remedies it could have pursued

11  short of repossessing the property in violation of Washington law.  Nationstar's

12  contention that the alleged countervailing benefits outweighs the substantial injury

13  is also not persuasive.  The benefit of repairing a roof, winterizing a home, or

14

15  [3]    This statement was considered dicta by a later case, which noted that this

16  standard is "one, but not the only, meaning of 'unfair act or practice.'"  *Deegan v.*

17  *Windermere Real Estate/Ctr.-Isle, Inc.*, 197 Wash. App. 875, 889 n.47 (2017)

18  (citations omitted).  Here, both parties address this standard and thus the Court will

19  consider it in determining unfairness.

20

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 19

1   maintaining a pool or lawn does not outweigh the injury of being ousted from

2   one's home. ECF Nos. 222 at 20; 181 at ¶ 11. Examples of maintenance and one

3   isolated incident of repairing a roof does not negate the substantial injury here.

4   Therefore, Nationstar's rekeying of homes was an unfair practice under both

5   standards, as it was an illegal act and caused substantial injury.

6       Second, Nationstar's practice is also deceptive. "A plaintiff need not show

7   that the act in question was *intended* to deceive, but that the alleged act had the

8   *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105

9   Wash.2d at 785 (citation omitted, emphasis in original); *Panag*, 166 Wash.2d at

10  47. Here, Nationstar asserts that each Class member entered into a deed of trust

11  allowing Nationstar to enter their properties following abandonment and that

12  Nationstar could reasonably protect their property. ECF No. 222 at 21. Yet, the

13  Washington Supreme Court held that these entry provisions were unenforceable

14  and violated Washington law. ECF No. 89 at 17. Therefore, Nationstar's practice

15  of rekeying homes was deceptive because it had the capacity to lead borrowers to

16  believe they could no longer occupy their homes, which conduct is illegal under

17  Washington law.

18      Additionally, Nationstar's practice of posting a notice sign within the

19  window of a borrower's home was deceptive. The notice stated that the property

20  was found unsecure or vacant and was locked to protect the interest of the owner

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 20

1   and mortgagee in accordance with the terms of the mortgage.  ECF No. 166-4 at 3

2   (Ex. 36-4).  The sign also stated, "The key will be available to the owner of the

3   property or the representative only."  *Id.*  After reading this sign, Ms. Jordan called

4   the number listed for further information and believed that she had to move out of

5   her home and was only able to enter to remove her personal items.  ECF No. 166-1

6   at 9 (Ex. 1).  This belief highlights that the notice had the capacity to deceive the

7   borrowers into believing they could no longer live in their homes when they found

8   their doors locked and a sign posted that the mortgagee locked it in accordance

9   with the mortgage.

10          Accordingly, the Court concludes that Nationstar's practice of rekeying

11  homes before foreclosure was unfair and deceptive, thus satisfying the first

12  element of the CPA claim.

13      **2. Trade or commerce**

14          Nationstar does not address whether the second element of the CPA claim is

15  met and it is clear that Nationstar's practice of rekeying homes was conduct

16  occurring in trade or commerce.  Under RCW 19.86.010, trade or commerce is

17  defined as "any commerce directly or indirectly affecting the people of the state of

18  Washington."  RCW 19.86.010(2); *Panag*, 166 Wash.2d at 39.  A consumer or

19  business relationship is not required between the plaintiff and the actor, but merely

20  that the violation causes injury to the plaintiff's business or property.  *Panag*, 166

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 21

1    Wash.2d at 39.  Here, there was a business relationship between the borrowers and

2    Nationstar, but the violation also caused injury to the borrowers' property by

3    changing the locks.  Therefore, the Court finds that the second element of the CPA

4    claim is met.

5    **3. Public interest impact**

6        Nationstar also does not contest the public interest element, which is met.  In

7    a consumer transaction there are five relevant factors in accessing public interest:

8    (1) whether the alleged acts were committed in the course of defendant's business;

9    (2) whether the acts were part of a pattern or generalized course of conduct; (3)

10   whether repeated acts were committed prior to the act involving plaintiff; (4)

11   whether there is a real and substantial potential for repetition of defendant's

12   conduct after the act involving plaintiff; and (5) if the act involved a single

13   transaction, whether many consumers were affected or likely to be affected.

14   *Hangman Ridge*, 105 Wash.2d at 790.

15       Here, Nationstar's practice of rekeying homes was committed in the course

16   of its business and was part of its uniform practice of rekeying allegedly

17   abandoned homes.  It is less likely that Nationstar will repeat its practice after the

18   Washington Supreme Court ruled it was unlawful, but many consumers were still

19   affected.  Ms. Jordan alleges that 5,131 Washington homeowners were affected.

20

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 22

1  ECF No. 217 at 22.  Overall, these factors illustrate that public interest is impacted

2  and the third element is met.

3      **4. Injury to business or property[4]**

4          Injury is defined "liberally to include when 'the plaintiff's property interest

5  or money is diminished … even if the expenses caused by the statutory violation

6  are minimal." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135 (9th Cir. 2016)

7  (citing *Panag*, 166 Wash.2d at 57).  The Ninth Circuit emphasized that this

8  element has only been used to exclude suits for personal injury or emotional

9  distress and that the injury "need not be great, or even quantifiable." *Id.* (citation

10  omitted).

11          Here, borrowers who had their homes rekeyed prior to foreclosure suffered

12  injury to their property, which the Washington Supreme Court determined ousted

13  them from their homes.  ECF No. 89 at 16.  The Class members were harmed by

14  the drilling and removal of their own locks, the installation of replacement locks,

15  and the entrance of Nationstar into their homes.  ECF No. 166-7 at 14–15 (Ex. 7).

16

17  [4]    Nationstar argues that Ms. Jordan and Class members do not establish the

18  fourth element because some members did not have their locks rekeyed, but the

19  Court already ruled that it will only address the claims of Class members who had

20  their homes rekeyed before foreclosure.  ECF No. 222 at 22.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 23

1  Under this broad definition of injury, the Court finds that the Class members'

2  property was diminished and thus they suffered injury.

3  **5. Causation**

4  Under the final element, "[a] plaintiff must establish that, but for the

5  defendant's unfair or deceptive practice, the plaintiff would not have suffered an

6  injury." *Schnall v. AT&T Wireless Servs., Inc.*, 171 Wash.2d 260, 278 (2011).

7  Here, the Class members are able to establish proximate cause because the injury

8  to their property was caused by Nationstar rekeying their homes. But for

9  Nationstar's unfair and deceptive practice of rekeying homes before foreclosure

10  according to its unlawful entry provisions, the Class members would not have

11  suffered the injury of having new locks put onto their doors and being ousted from

12  their homes.

13  Accordingly, the Court concludes that Ms. Jordan and Class members have

14  established their CPA claim for all members who had their homes rekeyed by

15  Nationstar prior to foreclosure. The Court grants summary judgment for all such

16  Class members.

17  **D.    Damages**

18  **1. Physical injuries to properties and fair market rental value**

19  As discussed above, the Court determined that Class members who had their

20  homes rekeyed prior to foreclosure are entitled to $535,376 for lock changes.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 24

1  Plaintiff argues that this amount may be trebled under the CPA, but "such

2  increased damage award for violation of RCW 19.86.020 may not exceed twenty-

3  five thousand dollars." RCW 19.86.090; but see *Smith v. Behr Process Corp.*, 113

4  Wash. App. 306, 346, 54 P.3d 665, 686 (2002) ("Although the decision to award

5  treble damages is discretionary, the trial court erred in concluding that it had no

6  discretion [to award treble damages] as to the represented class members."). The

7  Court reserves this issue of trebled damages under the CPA until trial on the

8  remaining actual damages.

9      The Court also previously determined that Class members are entitled to the

10  fair market rental value during the time in which Nationstar rekeyed their homes to

11  when the default was cured or the property was liquidated. The exact calculation

12  of the reasonable rental value is left as a factual question for trial.

13  **2. Disgorgement of ill-gotten profits**

14      Ms. Jordan also contends that Nationstar must disgorge the profits obtained

15  by its trespass on the Class members' property. ECF No. 217 at 29. Ms. Jordan

16  requests the amount of fees that Nationstar received from Class members for its

17  property preservation services, excluding inspection fees because some were

18  performed without entry onto the properties. *Id.* at 30. Ms. Jordan asserts that

19  Nationstar should not be permitted to retain the benefits from its unlawful trespass

20  on Class members' property. ECF No. 237 at 30 (citing *Restatement (Third) of*

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 25

Case 2:14-cv-00175-TOR    ECF No. 262    filed 11/21/17    PageID.6673    Page 26 of 27

1  *Restitution and Unjust Enrichment* § 40 (2011)). Ms. Jordan asserts that some

2  Class members paid the fees when they sold their homes, obtained loan

3  modifications, or brought their loans current. *Id.* Others fees were paid to

4  Nationstar from foreclosure or short sale proceeds. *Id.*

5      Nationstar asserts that Ms. Jordan did not pray for disgorgement of these

6  profits in her complaint. ECF No. 222 at 26. At oral argument, Nationstar

7  emphasized that there can be no disgorgement because the Class members did not

8  pay any preservation fees.

9      "Under Washington law, disgorgement of fees is a remedy "—not a cause of

10  action. *Block v. Law Offices of Ben F. Barcus & Assocs., PLLC*, 189 Wash. App.

11  1006 (2015) (citation omitted); see also *Young v. Young*, 164 Wash. 2d 477, 487–

12  88 (2008) ("the trial court . . . has tremendous discretion to fashion a remedy "to do

13  substantial justice to the parties and put an end to the litigation."). Plaintiff sought

14  other just and equitable relief in her Second Amended Complaint for Damages.

15  ECF No. 2-19 at 15. Accordingly, disgorgement is an available remedy.

16      The Court reserves application of the disgorgement remedy for trial as

17  genuine disputes of material fact remain and more evidence is required to make a

18  determination.

19  //

20  //

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 26

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Partial Summary Judgment (ECF No. 217) is

   **GRANTED in part,** as indicated herein.  Partial summary judgment is

   **GRANTED** as to liability for common law trespass and Consumer

   Protection Act violations for all Class members who had their properties

   rekeyed prior to foreclosure.

2. The District Court Executive is directed to enter this Order and furnish

   copies to counsel.

**DATED** November 21, 2017.

THOMAS O. RICE
Chief United States District Judge

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ~ 27