UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| GINA L. BRITTON, a single woman, and JEREMY N. LARSON, a single man, and on behalf of others similarly situated, | NO: 2:18-CV-0041-TOR |
| Plaintiffs, | ORDER DENYING CLASS CERTIFICATION |
| v. | |
| SERVICELINK FIELD SERVICES, LLC, formerly known as LPS FIELD SERVICES, INC., | |
| Defendant. | |

BEFORE THE COURT are Plaintiffs Gina L. Britton (and Jeremy N.

Larson's)[1] Motion for Class Certification (ECF No. 51) and Defendant

---

[1] The original motion for Class Certification was brought by Gina L. Britton
and Tami J. Frase-Phillips, but Ms. Frase-Phillips' claims have since been

dismissed and Jeremy N. Larson was added as a named Plaintiff. ECF No. 67.

ORDER DENYING CLASS CERTIFICATION ~ 1

ServiceLink Field Services, LLC's Motion to Exclude (ECF No. 84) and Motion for Evidentiary Hearing (ECF No. 85). The Court reserved ruling on the necessity of an evidentiary hearing until after considering the parties' oral arguments on the other motions. On June 25, 2019, the Court heard oral argument on the Motion to Certify and Motion to Exclude. The Court has reviewed the file and the records therein, heard from counsel and is fully informed. For the reasons discussed below, Plaintiffs' Motion to Certify (ECF No. 51) is **denied.** Defendant's Motion to Exclude (ECF No. 84) is **granted**. Defendant's Motion for Evidentiary Hearing (ECF No. 85) is **denied as moot**.

## BACKGROUND[2]

The instant suit involves a claim by Plaintiffs Gina L. Britton and Jeremy N. Larson, personally and on behalf of others similarly situated, against Defendant ServiceLink Field Services, LLC,[3] for its part in securing properties subject to foreclosure.

//

//

---

[2]    The underlying facts are not in dispute, unless otherwise noted.

[3]    Given Defendant is a successor in interest to LPS Field Services, Inc., the Court need not distinguish between ServiceLink and LPS Field Services.

A. **ServiceLink; Complained-of Services**

ServiceLink provides asset preservation services to lenders by contracting with vendors, who provide the actual services. ECF No. 73 at 17. Among other things, ServiceLink would – through its vendors – "confirm owner occupancy, [] preserve property where owners died or property was otherwise vacant or abandoned, address insurance losses/repairs, remedy code or HOA violations, [] address emergencies like burst pipes[,]" and "abate[] hazards/nuisances to prevent deaths/injuries." ECF No. 73 at 17. Specifically at issue here, ServiceLink would drill out and replace the locks on homes – barring access *through that entry* – and leave a sticker on the home informing the owner of how they can get a key. ECF No. 73 at 17. In all, ServiceLink worked with 28 lenders and 27 unrelated vendors during the proposed class period. ECF No. 73 at 17. Notably, "Lenders represent their authority to [order the services to] ServiceLink and warrant compliance with all laws[.]" ECF No. 73 at 17.

In 2016, the Supreme Court of Washington held that contract provisions found in deeds of trust which purport to allow lenders to take possession of homes after default, but before foreclosure, were invalid. *Jordan v. Nationstar Mortg., LLC*, 185 Wash.2d 876 (2016). As a result, all entries and actions on the property – specifically, drilling out and replacing the locks – based *solely* on this pre-default consent were deemed to be a trespass that effectively interfered with the owner's

property rights. Here, Plaintiffs are seeking to hold Defendant liable for working as the middleman between the lenders and the vendors.

B. **Plaintiff Britton**

Britton purchased property located at 35 E. Walton, in Spokane, Washington, with Sean Britton (her future husband) and her grandmother Esther Haugen ("Haugen") as co-owners, using an FHA-loan. ECF No. 73 at 19. Britton testified that Haugen was on the loan "so [Britton] could get into a house" and that Haugen thereafter tried to transfer her property interest to Britton, but the document purporting to do so was not valid. ECF No. 80-2 at 152-153. Haugen passed away in 2004 and her heirs have not been joined as named parties.

Britton fell behind on payments and her lender enlisted ServiceLink to determine the occupancy status. *See* ECF No. 80-3 at 127 (letter re: default on loan), 130 (Letter verifying occupancy). "In 2011, Britton entered into a forbearance agreement with Wells Fargo, promising to owner-occupy" the Walton house ("Walton"), but "[w]ithin days she [] moved to Northport" and "admit[ted] Northport was her primary residence." ECF No. 73 at 19. Britton later told the foreclosure trustee and Wells Fargo that Walton was "owner occupied", despite her only allegedly visiting the property once or twice a month to make repairs. ECF No. 73 at 20. "Britton admits Walton looked abandoned with no utilities, missing

siding and furnishings, discontinued construction, accumulated mail, no garbage service, and no one living there." ECF No. 73 at 20.

"On December 30, 2013, Wells Fargo noted emergent conditions—that Walton was likely to freeze—and ordered preservation, providing its guidelines and instructions." ECF No. 73 at 20. "On January 2, 2014, a vendor reported Walton was vacant and that it had changed the front door lock and padlocked the shed." ECF No. 73 at 20. Britton asserts that the vendor also replaced the lock on the garage. ECF No. 73 at 20. The vendor reported that the toilet had frozen and the line broke. ECF No. 73 at 20-21.

Britton went to the property on or about January 11, 2014 and was able to enter the house through the back door with her own key. ECF Nos. 73 at 21; 56-1 at 30-31. ECF No. 73 at 21. According to Britton, "[t]he inside was absolutely trashed." ECF No. 80-2 at 32. "There was garbage thrown all over the floor", "urine all over the bathroom", and "[t]he toilet was broken." ECF No. 80-2 at 32. Britton received a key to the changed lock and, on January 16, 2014, Britton broke the key off in the lock to keep ServiceLink from entering the property thereafter. ECF Nos. 73 at 21; 56-1 at 31. At no time was Britton locked out of the house.

Britton blamed ServiceLink for "destroy[ing]" her house and for stealing property inside the home. ECF No. 80-3 at 213-14. She complained to the lender that ServiceLink was "stalking" her at her property. ECF No. 80-3 at 215.

Britton's lender tried to arrange a meet-and-greet between Britton and ServiceLink to discuss the issues, but Britton did not want to deal with them. ECF No. 80-3 at 216. The lender "got a different contractor" with ServiceLink to discuss the issue with Britton, but Britton's partner (Time Lowe) told the lender to "go ahead and send them out" and relayed his intention to physically assault and detain the contractor, concluding with "[h]ow does that sound?". ECF No. 80-3 at 216; *see also* ECF No. 80-3 at 247. The lender ultimately purchased the home in a foreclosure sale on June 13, 2014.

### C. **Plaintiff Larson**

Larson purchased property at 5501 NE 49th Street, Vancouver, Washington. ECF No. 73 at 23. "On March 17, 2017, ServiceLink informed Larson's lender [that the property] was reported unsecure and asked if [Larson's lender] had the borrower(s) consent to enter, secure, and maintain the property." ECF No. 73 at 23. ServiceLink then changed a lock on the property. However, Larson, like Britton, was never locked out and he was able to gain access to the property immediately (only the backdoor lock was replaced). ECF No. 73 at 23. Larson continued to live at the property and "never demand[ed] a lock change or lockbox removal." *See* ECF Nos. 73 at 23; 82-3 at 1-2, ¶ 2.

Defendant contends that it is still determining whether the lender had actual authority from Larson or whether the lock change was a result of a mistake, given

Defendant changed its policies post-*Jordan* to require post-default consent before performing a lock change.  ECF No. 73 at 23.

### D. **Claims**

Based on its role in facilitating the asset preservation services, Plaintiffs assert that ServiceLink is liable for (1) Common Law Trespass; (2) Intentional Trespass in violation of RCW 4.24.630; (3) Negligent Trespass; (4) violation of the Washington Consumer Protection Act, RCW 19.86; and (5) Negligent Supervision. ECF No. 69 at 36-49, ¶¶ 7.1-11.11.  Plaintiffs seek damages, attorneys' fees, costs, and injunctive relief.  ECF No. 69 at 49-50.

Plaintiffs now move the Court to certify their proposed class.  ECF No. 51; *see* ECF No. 69 at 23, ¶ 6.1 (proposed class definition).  Defendant opposes the motion and requests the Court exclude the Plaintiff's expert opinion.  ECF Nos. 73; 84.  These motions are now before the Court.

## GOVERNING LAW; STANDARD OF REVIEW

Federal Rule of Civil Procedure 23 governs class actions.  "Rule 23 specifies that the party seeking class certification bears the burden of demonstrating that (i) all four requirements of Rules 23(a) and (ii) at least one of the three requirements under Rule 23(b) are met."  1 McLaughlin on Class Actions § 4:1 (15th ed.).  Rule 23(a) lists the following four "prerequisites" for a class action:

> (1)  the class is so numerous that joinder of all members is impracticable;
> (2)  there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(3) – upon which Plaintiffs rely – provides that a class action may be maintained if the four prerequisites under 23(a) are present and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). "Broadly speaking, the joint purpose of these class certification conditions is to ensure that it is fair to purported absent class members and not meaningfully prejudicial [to] defendants to depart from the paradigm of non-representative litigation because the claims of (and defenses against) a representative plaintiff are sufficiently similar to those of class members." 1 McLaughlin on Class Actions § 4:1.

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle &*

*Jacquelin*, 417 U.S. 156, 178 (1974) (citation omitted).  As such, in the class action setting, courts do not have "any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177.  However, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Gen. Tel. Co. of Sw.*, 457 U.S. at 160 (internal quotation marks and citations omitted).

At the certification stage, the party seeking to maintain a class action under Rule 23(b)(3) cannot rely on pleadings, but "must affirmatively demonstrate his compliance" with Rule 23, including the requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

## DISCUSSION

The Court finds that Plaintiffs have failed to demonstrate that a class action should be certified.  As discussed below, because Britton and Larson were never locked out of their homes – by far the gravamen of the proposed class damages – their claims are not typical of the proposed class and they are not adequate representatives.  Further, Plaintiffs have failed to demonstrate that common questions predominate because (1) absent a viable methodology, the issue of

damages will predominate over the common questions, and (2) Plaintiffs have not provided a viable class-wide methodology for determining loss of use damages.

## A. **Typicality**

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011); Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether *other members have the same or similar injury*, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal citations omitted; emphasis own) (quoting *Hanon v. Dataproducts, Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The purpose of the typicality requirement is to ensure that the interests of the class representative align with those of the class, so that by prosecuting his own case he simultaneously advances the interests of the absent class members." 1 McLaughlin on Class Actions § 4:16.

While "Rule 23(a)(3) does not require the representative plaintiffs to have the same claim size or financial interest as the class they seek to represent[,]" *Id.* § 4:17, the Court finds that Britton and Larson are not typical of the proposed class because they did not "suffer the same injury" as the class they seek to represent. *Ellis*, 657 F.3d at 984 ("The test of typicality is whether *other members have the same or similar injury*" (emphasis own)); *Schlesinger v. Reservists Comm. to Stop*

*the War*, 418 U.S. 208, 216 (1974) ("To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents.").  Importantly, Plaintiffs seek damages for (1) the cost of replacing the damaged lock, (2) the value of rent for the time the members were *actually* ousted from the property (a proxy for loss of use of the property), (3) the amount of fees charged to the members for the services, and (4) disgorgement of earnings.  *See* ECF No. 69 at 35, ¶¶ 6.34.6, 6.36.  However, neither Britton nor Larson have a claim for recovering rental value because they were never locked out of their houses, which is by far the most substantial claim for damages.  Given the fact that (1) whether Plaintiffs can recover the fair market rental value is not a settled issue, *see* ECF No. 51 at 24, and (2) Britton and Larson have no personal stake in securing such a remedy, the Court cannot say Britton and Larson's claims are typical of the class members.  *See Hesse v. Sprint Corp.*, 598 F.3d 581, 592 (9th Cir. 2010) ("As a resident of Missouri, Benney's injury was not typical of the Washington Plaintiffs' injury, and, as a result, he failed to vigorously prosecute their claims or avoid the conflict between their legal interests.").

B. **Adequacy**

"An adequate representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that

are antagonistic to the interests of the class." *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990) (citations omitted). Among other considerations, courts look to the "lack of any personal commitment to the action on the part of the representative plaintiff" and the "remedy sought by plaintiff". *Id.* (citations omitted). Moreover, "if the putative representative's conduct raises questions about his or her credibility or integrity, certification will be denied." 1 McLaughlin on Class Actions § 4:27.

The Court finds Britton and Larson are not adequate representatives of the class. As discussed above, they do not have any personal commitment to the recovery of the value of rent for damages because they were never locked out of their houses. As such, they cannot adequately represent a class where the predominate source of damages stems from damages they do not share. *See Hesse*, 598 F.3d at 588-89 (9th Cir. 2010) (representative was not typical because he did not suffer the injury suffered by Washington residents). Indeed, they do not even have standing to pursue such a remedy because litigating that matter will not redress Plaintiffs' injuries.

The Court also finds that Plaintiffs have failed to demonstrate that Britton can fairly fulfill her role as a fiduciary to the putative class members. First, Britton has an uncontroverted record of lying with respect to the property at issue (specifically telling the lender that the property was owner-occupied, despite only

visiting the property one or two times a month for much-needed repairs).  Second, Britton admitted to breaking out the windows, gutting the kitchen cabinets and the bathroom sink and tub, leaving the house unsecured, and also breaking off the key inside the changed lock.  *See* ECF No. 80-2 at 76 (Britton denying she did anything to damage the property then admitting she broke the windows out because she was "pissed off because Wells Fargo stole my house."); ECF No. 80-2 at 82, 99 (admitting she took the bathtub and sink from the bathroom, along with the cabinets from the kitchen); ECF No. 80-2 at 89 (admitting she broke the key off in the door).  Third, Britton does not have a viable trespass claim (because of the statute of limitations), and there is a question about whether the fractured ownership of the Walton house will become an issue unique to Britton.  Esther Haugen's heirs have not appeared, nor has co-owner Sean Britton.  Additionally, Britton is an admitted daily user of marijuana that previously used the property to grow marijuana.  At the very least, these problems would be a serious distraction to the merits of the underlying case.

The Court also finds that Plaintiffs have failed to demonstrate that Larsen can fairly fulfill his role as a fiduciary to the putative class members.  Larson is an admitted marijuana grower who grew 205 plants in his house, was arrested, pleaded guilty and was placed on probation.  He was never evicted or left.  He lost one stick out of the bundle of sticks—exclusive possession, but that did not bother

him at all.  He continued to live there for over two years without paying the mortgage yet collected somewhere between $1,250 to $1,500 a month from three different tenants.  Larsen maintained two properties, the subject property on 49th Street and another on 91st street where he lives with his two children and their mother, —but he claims to live in both houses.  These issues would be a serious distraction to the merits of the underlying case and compound the complexity of determining damages for someone that does not live with his family in the 49th street property and was never locked out.

C. **Predominance**

While the Court finds there are common questions of law—namely, whether Defendant is liable for trespass and for its conduct under the Washington Consumer Protection Act—the Court also finds the individualized question of damages, without a common methodology in assessing those damages, will overwhelm the common questions.  The Court further finds that Plaintiffs have failed to present a viable class-wide method for calculating damages.

1.  Individual questions of damages predominate

"The test [for predominance] is whether adjudication of the class representatives' claims, taking into consideration (among other things) how damages must be proved in the case and any affirmative defenses available to defendant, will effectively establish a right of recovery for all other class members

without the need to inquire into each individual's circumstances."  1 McLaughlin on Class Actions § 5:23.  "Predominance is thus not a strict counting exercise; rather, it requires a weighing of the overall significance of common issues against those requiring individual proof and evaluation of whether common issues are integral to every class member's claim and significantly advance each class member's claim toward resolution."  *Id.*  "Predominance is established if the legal or factual issues that can be resolved through generalized, common evidence are more significant to the litigation than the issues subject only to individualized proof."  *Id.*  "If what remains behind for subsequent individual adjudication is more significant, certification should be denied."  *Id.*

Critically, Plaintiffs seek to recover the fair market rental value for the time class members were locked out of their houses.  This requires two individualized inquiries into (1) the rental value for each member; and (2) the duration the member was locked out of their house.  In comparison to the relatively straightforward common issues – whether Defendants are legally liable for the undisputed conduct – that are mostly legal in nature, the individualized inquiries are highly fact sensitive and unique to each member.  In light of the little leg-work needed to address the issues common to all members, the individual inquiries would overwhelm the common issues, absent some workable methodology.  In such circumstances, the Court cannot say that the common issues predominate or

that a class action is the superior method of resolution.  As discussed below,

Plaintiffs attempt to buttress these concerns by proposing a class-wide model that

streamlines the process of calculating fair rental value, but this attempt falls far

short.

### 2.  Plaintiffs do not have a viable class-wide methodology

Where damage calculations would otherwise predominate over the common

questions, a class may be maintained if the plaintiff demonstrates "that the

damages resulting from that injury [are] measurable 'on a class-wide basis'

through use of a 'common methodology.'" *See Comcast Corp.*, 569 U.S. at 30.

That is, individualized claims for damages can be manageable "where the fact of

injury and damage breaks down in what may be characterized as 'virtually a

mechanical task,' 'capable of mathematical or formula calculation[.]'" *Windham*

*v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (footnotes omitted); 2

McLaughlin on Class Actions § 8:12.

> On the other hand, where the issue of damages and impact does not lend
> itself to such a mechanical calculation, but requires "separate 'mini-
> trial,(s)" of an overwhelming large number of individual claims, courts have
> found that the "staggering problems of logistics" thus created "make the
> damage aspect of (the) case predominate," and render the case
> unmanageable as a class action.

*Windham*, 565 F.2d at 68 (footnotes omitted); 1 McLaughlin on Class Actions

§ 4:19 ("Courts have routinely denied certification where determining individual

damages is not susceptible to a readily-applied, mechanical computation, but rather is dependent on the unique or complex circumstances of each class member").

Plaintiffs proffer the opinion of Dr. Kilpatrick for the position that the damages can be calculated on a class-wide methodology. *See* ECF No. 55. Defendant argues the opinion is inadequate because the damage calculations are not reliable or relevant. ECF No. 84 at 5. Plaintiffs, however, urge the Court to view the potential problems as an issue of weight and not admissibility, and note that Dr. Kilpatrick's opinions have not yet been finalized. The Court agrees with Defendants and finds Plaintiffs have failed to present a viable methodology for calculating damages; the matter is not one of weight, but of admissibility as a matter of relevance. Moreover, the time to present a valid methodology is now, at the certification stage, not later.[4]

Dr. Kilpatrick proposes finding the fair market rental value based on the value of the property and the relevant rent-to-price ratio *for the county*. Dr. Kilpatrick determines the value of the property by using the Greenfield automated valuation model (AVM) when there are a sufficient number of "comparable properties". Under this approach, the AVM calculates the proposed value of a property by comparing like sales based on the property type, the location, and the

---

[4] Notably, this issue was not addressed in the case of *Jordan v. Nationstar*.

time.  ECF No. 55 at 22, ¶ 52.  Dr. Kilpatrick only identifies four property types: single-family residences, condominiums, townhouses, and commercial properties.  ECF No. 55 at 22, ¶ 52.  The "location" is a region of the state up to individual neighborhood.  ECF No. 55 at 22, ¶ 52.  At its base, the AVM simply assigns a value to a home based on the average value of properties with certain characteristics and within a certain geographical area.

Dr. Kilpatrick determines the rent-to-price ratio for the relevant county by (1) comparing actual rental transactions to the value of the rental home (calculated by using the AVM) to determine a rent-to-price ratio, or (2) using summarized rental values from the U.S. Census Bureau and HUD data to determine a non-market based rent-to-price ratio, depending on the available data.  ECF No. 55 at 28-31, ¶¶ 67-75.  The proposed fair market rental value is then determined by applying the rent-to-price ratio to the proposed value of the house.

Once the daily rental value for the property is determined, the purported rental value is multiplied by the number of days the member is locked out to determine the total damages for loss of use.  Dr. Kilpatrick calculates the number of days locked out by beginning with the date the lock-change services were provided and ending with the date the property was sold (where no records of a sale occurred, the end date is ongoing and set at the day of the report).  ECF No. 55 at 11, ¶ 17.

The proposed method has several problems. First, there appears to be no real method for determining which variables to use for the AVM—at the very least, Dr. Kilpatrick failed to explain such. Dr. Kilpatrick states that the "[i]nformation most relied upon is living area, location, and sale date" and that he "determined that incorporating other variables, such as number of bedrooms, basement size, attic size, and fireplace characteristic, would depend on the property type and ownership." ECF No. 55 at 21, ¶¶ 51-52. He then states that "[i]n the AVM used to model the plaintiff properties many of the possible property characteristics were not necessary because of the high statistical correlations with the variable [he] had already chosen . . . ." ECF No. 55 at 21, ¶ 51. However, Dr. Kilpatrick does not explain (1) the method of determining what characteristics to use, (2) why he chose the variables he did for Britton and Larson, or even (3) what variable he used for Britton and Larson.[5] Without answers to these questions, the

_____

[5]     Notably, Dr. Kilpatrick determined that "comparable properties" for Britton and Larson are "residential single family homes [in the subject property county] where the primary owner is an individual." ECF No. 55 at 24, ¶ 58. This seems to suggest that Dr. Kilpatrick did not use other variables for his calculations. If true, every single-family home would be valued the same as others in their neighborhood—a separate problem in and of itself. However, it appears Dr.

Court cannot adequately determine the actual methodology or whether the model is reliable.

Second, Dr. Kilpatrick's proposed method fails to take into account information that is critical to a fair calculation of rental value. Importantly, Dr. Kilpatrick assumes "that the actual condition of [the] home falls within . . . the definition of average for that marketplace." ECF No. 83-1 at 105. In other words, the actual condition of the home is not taken into account when determining rental value. This information is important because Britton's property was not even inhabitable, as may be the case for many other distressed properties. As such, awarding rental value based on the average house condition would result in a windfall to Britton (and others similarly situated) and violate Defendant's Seventh Amendment right to a jury trial and due process.

Third, the method for determining the number of days locked out is wholly insufficient. First, the method assumes every member was actually locked out

---

Kilpatrick may have used additional variables because square feet, acres, year built, and total baths are included as variables for Britton and Larson on Table 1 of Dr. Kilpatrick's declaration, although Dr. Kilpatrick does not mention their application. ECF No. 55 at 25-26, ¶ 61. In any event, this ad-hoc, unexplained approach as to what factors should be considered is anything but methodical.

beginning at the time of the service; yet both class representatives were never locked out. Second, the method assumes every member was locked out until the time of foreclosure or sale of the house and assumes the lock-out is ongoing where no record of the sale is found. *See* ECF No. 55 at 10-11, ¶¶ 16-17. As with the first problem, this ignores the fact (1) that many members were *never* completely locked out and (2) that many others that were locked out were able to gain access to the home before foreclosure or some other sale occurred (the sticker left by Defendant informed the owner that they can recover the keys). Again, awarding damages based on such calculations would result in a windfall to Plaintiffs and violate Defendant's right to due process.

These problems are highlighted in Dr. Kilpatrick's application of the methodology to the representative Plaintiffs' cases. Using his method, Dr. Kilpatrick's proposed value for the Britton property was 40 percent over the actual sale price. ECF No. 84 at 7. Further, Dr. Kilpatrick determined Britton was locked out for 181 days and that Larson was locked out for 651 days, even though neither was actually locked out of their home for even one day. ECF No. 84 at 7. This demonstrates the impact of failing to take into account critical, individualized information as to the (1) the condition of the house (*e.g.* whether the house was even habitable) and (2) whether the member was actually ousted or whether he or she simply lost one stick (exclusive access) out of the proverbial bundle of sticks.

*See Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("Rule 23 [does not] permit[]dispensing with individual proof of damages").

At the hearing for class certification, Counsel for Plaintiffs suggested the model could be used as a base and then damages can be calculated by looking to each members' facts—in recognition that Britton and Larson were not even ousted—but this turns the whole methodology back into an individualized approach for each member. *See e.g., Corley v. Entergy Corp.*, 220 F.R.D. 478, 486 (E.D. Tex. 2004) ("Damages for trespass to land cannot be calculated without examining the individual circumstances underlying land ownership. Overall, trespass damages in this case cannot be calculated on a class-wide basis. Instead, each landowner is entitled to damages based on the specific characteristics of his or her land and the extent of the Defendants' trespass on his or her land.").

As such, Plaintiffs have not met their burden in demonstrating class certification is proper and their Motion (ECF No. 51) is **denied**. Given the opinion of Dr. Kilpatrick is not relevant or reliable, the Motion to Exclude (ECF No. 84) is **granted**. *See Wal-Mart Stores*, 564 U.S. at 354 (evincing doubt that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings). The Motion for Evidentiary Hearing (ECF No. 85) is **denied as moot**.

//

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiffs Gina L. Britton (and Jeremy N. Larson's) Motion to Certify (ECF No. 51) is **denied**.

2. Defendant ServiceLink Field Services, LLC's Motion to Exclude (ECF No. 84) is **granted**.

3. Defendant ServiceLink Field Services, LLC's Motion for Evidentiary Hearing (ECF No. 85) is **denied as moot**.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** July 26, 2019.



THOMAS O. RICE
Chief United States District Judge